## In re MIDLAND VALLEY R. CO.
### No. 7964.

District Court, E. D. Oklahoma.
July 19, 1943.

---

R. Sturgis Ingersoll, of Philadelphia, Pa., and James D. Gibson, of Muskogee, Okl., for petitioner.

J. F. Brett, of Muskogee, Okl., for intervenor Jay Cartton.

Elbert Hinds, of Muskogee, Okl., for intervenor Adele Force Clark.

Before MURRAH and WILLIAMS, Circuit Judges, and RICE, District Judge.

PER CURIAM.

Midland Valley Railroad Company, an Arkansas corporation, operating 326 miles of main line of track from Fort Smith, Arkansas, through Northeastern Oklahoma to Wichita, Kansas, a carrier subject to Sec. 20a of the Interstate Commerce Act, 49 U.S.C.A. § 20a, on the 21st day of April, 1943, filed its petition for a debt adjustment in this Court, under Chapter XV of the Bankruptcy Act, 11 U.S.C.A. § 1200 et seq., the Chapter being entitled "Railroad Adjustments" and enacted October 16, 1942. The purpose of the filing of the petition was to secure the approval by this Court of a plan of debt adjustment of the petitioner dated January 11, 1943, as amended March 31, 1943.

Immediately following the filing of the petition there was convened a Special Court of three Judges in the manner provided by Section 266, as amended, of the Judicial Code, 28 U.S.C.A. § 380, and Section 713 of Chapter XV. This three Judge Court thereby became vested with and empowered to exercise all the powers

of the District Court sitting in equity and all the powers necessary to carry out the intents and provisions of Chapter XV.

At a public session of the Court held on April 26, 1943, we entered an order approving the petition as properly filed under said Chapter XV and filed in good faith, and directed that a hearing on the plan with respect to which the petition was filed should be held on the 21st day of June, 1943, and directed the petitioner to give specific notice to each of the corporate trustees under the indentures securing the securities affected by the plan, to the Secretary of the Treasury, to the Secretary of the Interstate Commerce Commission, and to each known holder of securities of the petitioner, whether or no such security holder was affected by the plan, at their respective addresses as shown by the records of the petitioner and by specific publication in newspapers of general circulation in the City of New York, New York, and the City of Muskogee, Oklahoma.

Pursuant to this direction a public hearing upon the plan was held on June 21, 1943, all of the Judges of the Special Court being present. Responsive affidavits of notice were filed by the petitioner. There was available to any person in interest the opportunity to intervene, to present evidence, and be heard. Certain objections to the plan were filed and the objectors were represented by counsel. The petitioner introduced evidence, both oral and documentary, with respect to all matters requiring consideration under Chapter XV and under the plan and was subject to cross-examination by the objectors.

After full scrutiny of the facts independently of the extent of acceptances of the plan, and of any lack of opposition thereto, and of the fact that the Interstate Commerce Commission under Section 20a of the Interstate Commerce Act has authorized the issuances or modification of securities as proposed by the plan, and of the fact that the Commission has made similar findings to those found herein, this Court approves and confirms the plan and the adjustment provided thereby, and by this opinion intends to express all of the findings under Chapter XV requisite as being necessary to sustain such approval and confirmation and the reasons for the conclusions reached.

*The Necessity for the Plan:* The petitioner has outstanding three issues of bonds secured by two mortgages, its First Mortgage Bonds secured by an indenture of First Mortgage of the petitioner to the Girard Trust Company, Trustee, of Philadelphia, Pennsylvania, dated April 1, 1913, which matured on April 1, 1943; its Series A Bonds and its Series B Bonds, hereinafter collectively termed Adjustment Bonds, maturing April 1, 1953, secured by an Indenture of Adjustment Mortgage of the petitioner to Fidelity Trust Company, Trustee, Philadelphia, Pennsylvania, now Fidelity-Philadelphia Trust Company, Trustee, dated April 2, 1913. The interest rate on the First Mortgage Bond is at 5% and is a fixed charge; the Adjustment Bonds are income bonds, the interest rate being 5% and payable only if earned under the formula contained in the Adjustment Mortgage.

There were originally issued and outstanding in the hands of the public $6,715,000 of the First Mortgage Bonds. Through the years the petitioner and its wholly-owned subsidiary, Sebastian County Coal & Mining Company, acquired $1,934,000 of these bonds by purchase in the open market, and its corporate trustee acquired and cancelled $31,000 with proceeds of released property, leaving outstanding in the hands of the Public $4,750,000. Faced with the maturity on April 1, 1943, of the $4,750,000 of First Mortgage Bonds, the petitioner, in consultation with the Reconstruction Finance Corporation, and financial institutions, endeavored to raise the money to meet the maturity. The effort was unsuccessful. These facts prompted the petitioner to prepare a plan of adjustment of its debt and to proceed with respect thereto under the provisions of Chapter XV.

The claims of the holders of the petitioner's bonds are the only claims affected by the plan. Pertinent data with respect thereto is as follows:

First Mortgage 5% Thirty Year Gold Bonds Due April 1, 1943:

| | | |
|---|---|---|
| Total authenticated................ | $7,202,000 | |
| Less amount authenticated but not issued and held in the treasury of petitioner.......... | 487,000 | |
| Total authenticated and issued... | $6,715,000 | |
| Acquired by corporate trustee and cancelled ................ | 31,000 | $6,684,000 |
| Owned as follows: | | |
| By public ....................... | $4,750,000 | |
| By Sebastian County Coal & Mining Company, a wholly-owned subsidiary of petitioner | 1,934,000 | $6,684,000 |

Adjustment Mortgage 5% Forty Year Gold Bonds
Series A, Bearing Interest at 5%, If
Earned,—Due April 1, 1953

| | | |
|---|---|---|
| Total authenticated and issued.. | | $3,512,500 |
| Owned as follows: | | |
| By Sebastian County Coal & Mining Co. | 77,000 | |
| By petitioner | 1,960,000 | |
| By public | 1,475,500 | $3,512,500 |

Adjustment Mortgage 5% Forty Year Gold Bonds,
Series B, Bearing Interest at 5%, If
Earned, Due April 1, 1953

| | | |
|---|---|---|
| Total authenticated and issued.. | | $2,000,000 |
| Owned as follows: | | |
| By Sebastian County Coal & Mining Co. | 48,500 | |
| By petitioner | 1,121,000 | |
| By public | 830,500 | $2,000,000 |

The above mentioned bonds listed as being held by the petitioner, the Sebastian County Coal & Mining Company, and the general public, are found to be the bonds affected by the plan.

The petitioner has outstanding $4,006,500 common stock of par $50 a share and $3,999,250 of 5% non-cumulative preferred stock. All of the common stock and approximately 92% of the preferred stock is held by Muskogee Company, a Delaware corporation.

*The Nature and Provisions of the Plan:* A copy of the plan was filed with the petition as Exhibit C. It is fully informative. The adjustment with respect to the bonds affected by the plan are set forth in Article I of the plan and are in brief as follows:

1. The bonds held by the petitioner and by its wholly-owned subsidiary are to be cancelled, leaving as issued and outstanding, all in the hands of the public:

$4,750,000 First Mortgage Bonds
1,475,500 Series A. Bonds
830,500 Series B Bonds

2. The petitioner will covenant not to issue any additional bonds under either the First Mortgage or the Adjustment Mortgage, notwithstanding that under its present terms the gross amount issuable under the First Mortgage is $15,000,000.

3. The Maturity of the First Mortgage Bonds shall be extended from April 1, 1943, to April 1, 1963, that of the Adjustment Bonds from April 1, 1953, to April 1, 1963.

4. The interest rate on the First Mortgage Bonds is reduced from 5% to 4% remaining fixed, the interest rate on the Adjustment Mortgage bonds is reduced from 5% to 4% and remains contingent, with the provision that it shall be cumulative from the time of the payment of all of the First Mortgage Bonds up to an amount not exceeding at any one time 12% with respect to either series.

5. Under the present mortgages there is no provision for a sinking fund. The plan provides, with respect to the First Mortgage Bonds, a primary sinking fund in the amount of $71,250, being 1½% of the principal of the First Mortgage Bonds to be outstanding on the consummation of the plan, if so much is earned, and a secondary sinking fund in an amount equal to all of the petitioner's annual income after fixed charges, less the amount of the primary sinking fund and appropriations for additions and betterments as now found in the mortgages and interest payable on the Adjustment Bonds. The provisions with respect to the operation of the sinking fund are conventional ones. Bonds acquired by the sinking fund will be forthwith cancelled.

6. Additional security is provided for all the bonds, the prior lien being in the First Mortgage Bonds and the secondary in the Adjustment Bonds, by the pledge of 38,250 shares of the common stock of Muskogee Company, averred at the hearing to have a market value of approximately $8 a share, together with any other securities at any time owned by the petitioner other than securities of which it is the issuer and other than obligations of the United States Government.

7. The petitioner will covenant not to pay any dividends on either its common or preferred stock so long as any of the First Mortgage Bonds are outstanding.

8. The redemption price of the First Mortgage Bonds, as contained in the First Mortgage, up to its maturity date of April 1, 1943, was 102½ plus accrued interest. The plan provided that subsequent to April 1, 1943, the redemption price is and will be the principal amount of the bonds plus interest accrued to the redemption date.

9. The Adjustment Mortgage will be amended so that the First Mortgage Bonds may be refunded prior to maturity in their entirety, under certain limitations.

10. The final provision is to allow, within limitations, modifications in the terms of the bonds and the mortgages securing them, upon the affirmative vote of holders of 65% in principal amount of the pertinent issue.

184

The exact details with respect to these proposed adjustments are contained in the plan itself.

*The Jurisdiction of the Court:* Satisfactory proof has been presented to the Court and we so find that prior to the filing of the petition in these proceedings the petitioner had obtained an order from the Interstate Commerce Commission under Section 20a of the Interstate Commerce Act, the order by the Commission having been entered on March 24, 1943, wherein the Interstate Commerce Commission, with respect to the plan, authorized the issuance or modification of the securities as proposed by the plan, and included the specific findings required by Section 710(2) of Chapter XV of the Act; that at the time of the filing of the petition the plan has been assented to by not less than two-thirds of the aggregate amount of all claims affected by the plan, including at least a majority of the aggregate amount of claims of each class; that the principal operating office of the petitioner during the six months immediately preceding the filing of the petition was located at Muskogee, Oklahoma, within the territorial jurisdiction of this Court; that the petitioner had not been in equity receivership or in process of reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, at the time of filing its petition herein nor within ten years prior thereto. The petition averred that it was unable to meet its debts matured or about to mature, that it desired to carry out the plan of adjustment and a copy of the said order of the Interstate Commerce Commission of date March 24, 1943, was filed with the petition, made part thereof as Exhibit "D".

*Specific Findings, Conclusions and Reasons Therefor:* Satisfactory proof was presented at the hearing that the plan has been accepted by holders of more than three-fourths of the aggregate amount of the claims affected by the plan, including at least three-fifths of each affected class— and we so find.

The uncontradicted documentary evidence presented, inter alia, by the petitioner to the Court included: Copies of the petitioner's mortgages; certifications as to the bonds issued and as to the acceptances of the plan by the bondholders; the documents used by the petitioner in communicating with its bondholders; a statement of cash resources of the petitioner, the income account of the petitioner through the years from 1921 to 1942, inclusive, a statement of consolidated earning applicable to fixed charges from the years 1938 to 1942, inclusive; an analysis of the marked decline in gross earnings of petitioner occurring between the years 1927 and 1932; balance sheets of the petitioner and of its subsidiaries of various pertinent dates and earnings statements of the subsidiaries; tabulations of the applicability of earnings available for fixed charges, for interest, additions and betterments, and sinking fund, under the plan, extended to the future on the basis of the petitioner's belief that the average such earnings through the period 1938 to 1942 probably represent the minimum available during the immediately ensuing years; the application of the petitioner to the Interstate Commerce Commission with respect to the plan, the aforementioned order and report of the Commission in response thereto, the forms of supplemental indentures proposed to be used by the petitioner in amendment of its present mortgages, the forms having been approved by the mortgage trustees; and tabulations showing the amount necessary under the plan to be earned by the petitioner prior to the payment of any interest on its Adjustment Bonds, compared with tabulations showing such a requirement under the present capital structure.

Oral testimony was presented inter alia with respect to these documents; as to the valuations placed upon the property of the petitioner by the Interstate Commerce Commission; and as to the pertinent factors of solvency, future financing, maintenance, service, fixed charges, feasibility, the temporary nature of the petitioner's inability to pay its debts, equitability, and other pertinent items.

We find that petitioner is not in need of financial reorganization of the character provided for under Section 77 of the Bankruptcy Act; that its inability to meet its debts matured or about to mature is reasonably expected to be temporary only; and that the plan, after due consideration of the probable prospective earnings of the property in the light of its earnings experience and of such changes as may reasonably be expected is in the public interest, and in the best interests of each class of creditors and stockholders; is feasible, financially advisable, and not likely to be followed by the insolvency of the petitioner or by need of further financial reorganiza-

tion or adjustment; that the plan does not provide for fixed charges (of whatsoever nature, including fixed charges on debt, amortization of discount on debt, and rent for leased roads), in an amount in excess of what will be adequately covered by the probable earnings available for the payment thereof; that the plan leaves adequate means for such future financing as may be requisite; is consistent with adequate maintenance of the property, and is consistent with the proper performance by the petitioner of service to the public as a common carrier; and will not impair its ability to perform this service; and, further, that the plan is fair and equitable as an adjustment as such will afford due recognition to the rights of each class of creditors and stockholders and fair consideration of each class adversely affected, and will conform to the law of the land regarding the participation of the various classes of creditors and stockholders.

In reaching the above conclusions the Court has scrutinized the facts independently of the extent of acceptances of the Plan and of any lack of opposition thereto, and of the fact that the Interstate Commerce Commission, under Section 20a of the Interstate Commerce Act, has authorized the issuances or modifications of securities as proposed by the plan, and of the fact that the Commission has made such or similar findings.

*Requests for Findings:* The petitioner has filed with the Court thirty-six requests for findings of fact and conclusions of law. They are all herewith affirmed.

█ *Reasons for Above Conclusions:* The immediate and only necessity of the petitioner coming before the Court was the maturity of its First Mortgage Bonds on April 1, 1943. Through the thirty-year life of these bonds full interest has always been paid upon them and through the past twenty years full 5% interest has been paid upon the Income Series A and Series B Adjustment Bonds, excepting that at the depth of the depression but partial interest was paid on its Series B Bonds through a three-year period. Every year for the past twenty years the petitioner has earned income available for dividends upon its stock though no dividends have been paid since 1931. By purchases in the open market petitioner has reduced its bonded debt in the hands of the public from a total of $6,715,000 First Mortgage Bonds to the

present amount of $4,750,000; from $3,512,500 Series A Bonds to $1,475,500 Series A Bonds; from $2,000,000 Series B Bonds to $830,500 Series B Bonds. The petitioner is in a strong cash position. The property has been adequately maintained. Throughout the 1930's and through 1942 the gross earnings of the property have levelled off to approximately $1,500,000 per annum. There would appear to be no clouds on the horizon which would indicate that this gross figure would be further reduced. The record of past experience and the history of the property would indicate that in the future it would be as good as in the immediate past, and that immediate past has not been affected by war business to such a degree as to make the immediate past an over-optimistic yardstick as to the future. The reduction in fixed and income charges under the plan should make substantial sums available for the retirement of bonds by operation of the Sinking Fund. The financial structure is not a complicated one. The Interstate Commerce Commission, which we may regard as an expert in these matters, has found and so expressed in its order and report with respect to the plan, that the "Applicant (petitioner) has been efficiently and economically operated. The plan makes no provision for any change of management. On the contrary, it will if adopted prevent the disruption that sometimes results from changes occasioned by receivership." This is an important conclusion, and this Court reaches that conclusion independently of the statement by the Commission.

The above factors, combined with the provision under the plan that no dividends are to be paid so long as any First Mortgage Bonds are outstanding, and that during that period all income after operating costs and taxes shall be applied to the payment of interest, the retirement of debt, or for additions and betterments within the limitation fixed by the present mortgages, are convincing proof that the petitioner merely needs a delay in its obligation to pay its bonded debt and that the prospect is favorable, by operation of the sinking fund and otherwise, that the petitioner will pay all of its debts in full.

It appears obvious to this Court that the petitioner is not in need of drastic reorganization of the kind provided in Section 77; and that a proceeding under Section 77 would not be beneficial to either the security holders or the public.

It appears equally obvious that a voluntary plan, such as is this, is, from the point of view of the security holders, preferable to receivership or reorganization under Section 77. The plan, if adopted, insures a continuation of service by an effective management and is thus necessarily in the public interests. The respective liens of the bondholders are preserved, their security improved, and such modifications in their contractual rights as are proposed, appear to be in the long run beneficial to each class of creditor as well as to the stockholders.

There would appear no factor suggesting a lack of feasibility in the plan. The strong cash resources, the provisions now contained in the mortgages with respect to additions and betterments, the net earnings record of the petitioner, its particularly favorable operating ratio, and the testimony with respect to the future operations and earnings all suggest that the plan would solve the present financial problem and would not be followed by an insolvency or the need of financial reorganization or adjustment.

The fixed charge of the petitioner in the past has been up to 5% per annum on $6,715,000 of First Mortgage Bonds. It has always been amply earned. The plan reduces the fixed charge to 4% on $4,750,000 of the First Mortgage Bonds. The operation of the sinking fund will continually reduce the amount of fixed charges. The history of the petitioner's property does not suggest the necessity of a need for greater sums for additions and betterments than are provided for under the mortgages. The history of earnings as prognosticated into the future and considered in connection with the operation of the sinking fund indicates that the final payment of the mortgages by refund or other means, on or before their extended maturity dates, should by no means create difficult problems. The history of the petitioner and the strengthening of its financial position through the operation of the plan conclusively indicates that the plan is consistent with adequate maintenance and that the plan is fully consistent with proper performance by the petitioner of service to the public.

■ In concluding that the plan affords due recognition to the rights of each class of creditors and stockholders and fair consideration to each class adversely affected, and that it will conform to the law of the land regarding the participation of the various classes of creditors and stockholders, we have weighed the present contractual rights of the parties, the means available of enforcing those rights, the respective advantages and disadvantages, if any, to the various parties in interest resulting from the effectuation of the plan, and the value of the property.

■ In the bankruptcy sense the petitioner is fully solvent. The value of its property on an earnings basis and on the basis of valuation considered by the Interstate Commerce Commission is greatly in excess of the face value of its debt. The original cost as of December 31, 1933, with net changes to December 31, 1942, is recorded by the Interstate Commerce Commission as $12,311,099.57. No class of creditor or stockholder is by the plan called upon to make sacrifices for the benefit of a class holding a subordinate position. No class holding a subordinate position is given an opportunity to which a senior class is entitled. Competitive forms of transportation, i.e., passenger automobile, truck, the gasoline pipe line, the crude oil pipe line and the airplane, affecting as they have done and will, the entire nature of transportation, particularly in the area served by petitioner's railroad, tend to emphasize the advisability of the terms of the plan whereby the interest rate on the bonds outstanding is reduced and such savings as result from such a reduction be applied so long as any First Mortgage Bonds are outstanding, to the reduction of the principal debt. The reduction in the interest rate on the First Mortgage Bonds will particularly rebound to the benefit of the holders of those bonds by increasing the sums available for the sinking fund. The petitioner agrees to pay all of its available income in reduction of its debt until all of the First Mortgage Bonds are paid off in full. The direction of the plan is that of reduction of debt and in the meantime paying what would appear to be a reasonable interest rate. As income is made available for the reduction of the First Mortgage Bonds the Series A and Series B Bondholders benefit by the reduction of claims prior to their position. At present the petitioner has, as a free and unpledged asset, 38,250 shares of Muskogee Company common stock of a value testified to as being something over $8 per share. This stock is under the plan to be pledged as additional security for the mortgages with the present

relative priority of lien. An examination of each adjustment provided by the plan shows a due recognition of the rights of each class of creditors and stockholders and a fair participation in the assets and earning power of the property.

We find that all corporate action required to authorize the issuance or modification of the securities pursuant to the plan has been duly taken; the material presented to the Court in connection with the petitioner presenting the plan to the bondholders prompts our finding, as we do, that in connection with the plan the petitioner has not done any act or failed to perform any duty, which act or failure would be a bar to the discharge of a bankrupt, and that the plan and the acceptances thereof are in good faith and have not been made or procured by any means, promises or acts forbidden by the Bankruptcy Act or otherwise improper.

As the plan does not affect the obligation of the petitioner to pay the United States taxes and customs duties and the uncontradicted record establishes that the United States is not affected by the plan and the appropriate documents provided by Section 736 of Chapter XV have been transmitted to the Secretary of the Treasury, we find that the provisions of Sections 722, 736 and 737 of Chapter XV, 11 U.S.C.A. §§ 1221, 1236, 1237, have been complied with.

The plan makes full disclosure of the ownership by the directors of the petitioner and of the Muskogee Company and of their respective families of their ownership in the stock of the Muskogee Company which controls the petitioner, and in the securities of the petitioner. The record compels the conclusion that the continuation of the control of the petitioner by its present stockholders is equitable and in the best interests of the creditors and stockholders of each class and consistent with public policy.

*Expenses:* At the hearing upon the plan there was presented a schedule of expenses incurred in connection with the proceeding and plan or preliminary thereto or in aid thereof, as far as they were then ascertainable. Testimony was presented as to the facts and circumstances relating to their incurrence. They total $18,858.57. No objection was raised. We have considered them and we approve them as fair and reasonable and an appropriate order will be entered. At the hearing July 19, 1943, was set as the date to hear testimony with respect to such additional expenses, fees, reimbursements or compensation as may then be ascertainable, with direction that notice be given of that purpose for that hearing, by appropriate publication. Upon such items being fully disclosed to the Court the Court will enter such order as seems pertinent under the circumstances.

*Objections to the Plan:* Subject to further proof as to actual ownership of bonds of the petitioner, two parties were allowed to intervene and present their objections to the plan, the one allegedly a holder of $12,000 First Mortgage Bonds and the other a holder of $2,000 of First Mortgage Bonds. The objectors requested that the plan be amended by a continuation of the 5% interest rate on the First Mortgage Bonds, an increase of the primary sinking fund on the First Mortgage Bonds from 1½% to 2% and that a representative of the bondholders be named to the Board of Directors of the Company.

[5] Under the plan as presented, and on the basis of a 40% United States corporate income tax rate, the petitioner would have to earn $363,083 prior to there being any fund available for interest on the Series A and Series B Bonds. Under the present capitalization, based on 5% interest on the $4,750,000 First Mortgage Bonds in the hands of the public, only $291,833 need be earned before earnings would be applicable to Series A and Series B bond interest. Any increases under the plan in either the interest rate on the First Mortgage Bonds or on the amount of the primary sinking fund would exact markedly greater penalties against the Series A and Series B Bondholders, with, we would conclude, inequitable treatment of the Series A and Series B Bondholders. Moreover, any increase in the interest rate on the First Mortgage Bonds would necessarily reduce the amount of the funds available for the sinking fund on the First Mortgage Bonds which, in our opinion, would be financially inadvisable and not in accord with the laudable purpose of the plan of retiring the debt as rapidly as possible. The operation at a favorable operating ratio, with adequate maintenance and debt service through the 1930's, in face of a reduction in gross income from a figure approximating $4,000,000 to a figure approximating $1,500,000, the independent findings of the Interstate Commerce Commission with respect to the effectiveness of operation, our

188

own conclusions that the management has been effective, and a total lack of any testimony of any default on the part of the management, prompts us to the conclusion that the stockholders, in accordance with corporate law, should continue in sole control of the corporation.

At the conclusion of the hearing on June 21, 1943, counsel for the petitioner submitted for our consideration a tentative draft of a requested decree and copies thereof were furnished to counsel for objectors. The draft was made part of the record in the proceeding. We fixed July 19, 1943, at ten o'clock A. M., in the United States Courtroom at Muskogee, Oklahoma, as the time and place for further hearing, and acting upon a decree to be entered in this cause. Notice thereof was given to all parties in the case and petitioner was directed to publish notice thereof in a newspaper of general circulation in New York City, New York, and in Muskogee, Oklahoma.

Now on this the 19th day of July, 1943, this cause comes on for final hearing pursuant to notice and the Court, upon a consideration of the decree as presented, does now hereby approve the same and orders said decree to be entered and filed as the judgment of this court.