# DELAWARE & H. R. CORPORATION et al.
## v. DANCEY et al.

District Court, S. D. New York.

Aug. 4, 1943.

Wright, Gordon, Zachry, Parlin & Cahill and Thomas L. Ennis, all of New York City (John T. Cahill, Wallace P. Zachry, Don B. Stookey, and Howard C. Wood, all of New York City, of counsel), for petitioners.

Lawrence R. Condon, of New York City, for respondents.

Before L. HAND, Circuit Judge, and KNOX, and HULBERT, District Judges.

L. HAND, Circuit Judge.

This case comes up before a District Court of three judges, convened under § 713 of Chapter XV of the Bankruptcy Act, 11 U.S.C.A. § 1213, in two consolidated proceedings brought by the petitioners for the "adjustment" of an outstanding issue of $47,769,000 of first mortgage bonds. The mortgagor was the petitioner, Delaware and Hudson Company, which executed the mortgage on March 1, 1908; the bonds were due on May 1, 1943; bore interest at 4%; the amount authorized was $50,-000,000. In 1930 the Delaware and Hudson Company conveyed all its railroad property to the other petitioner, Delaware and Hudson Railroad Corporation, which assumed the debt, both principal and interest. (The "Company" owns all the shares of the "Corporation.") As the maturity of the bonds drew near in the autumn of 1941 the

petitioners (which for convenience we shall call collectively the "Road", except when it becomes necessary to distinguish between them) tried to refund the mortgage. This they found impossible. The lien of the mortgage was already $130,000 a mile, and in 1942 the bonds were selling at about 55; unless the lien was substantially increased, it would have been impossible to sell new bonds, and it was extremely undesirable to increase the lien. The "Road" unsuccessfully applied to a number of New York bankers and to the Reconstruction Finance Corporation, for some refunding arrangement, and we can see no reason to suppose that further inquiries would have resulted better. The respondents argue that they might have done so; but, like most of their other objections, this rests upon conjecture only. The Reconstruction Finance Corporation advised the "Road's" president that what was needed was a moratorium; and after consultation with the largest bondholders, the plan now before us was prepared. This postpones the payment of the bonds until May 1, 1963, at the same rate of interest (4%). In consideration for this extension, the "Road" agrees to several concessions. First, it will pay into the sinking fund of the original mortgage, two-thirds of its consolidated net income. (This is to continue until the principal of the bonds is reduced to $25,000,000 after which any future payments will be limited to $500,000 a year.) Second, it will pledge with the trustee all its holdings in the Albany and Susquehanna Railroad, and Rennsselaer & Saratoga Railroad—lessors of parts of its main lines. Third, in addition to two-thirds of its income it will pay into the sinking fund as much as it declares in any year as dividends. Fourth, it will pay at once a cash installment of ten per cent upon the principal of the bonds. Fifth, it will liquidate within five years a "portfolio" of accumulated securities, and pay half the proceeds into the sinking fund. (At the time the plan was proposed the "portfolio" was valued at about $5,000,000; on May 1, 1943, it had risen to $8,232,030.) The mortgage itself provided that one per cent of the face of the bonds should be added to the sinking fund annually; this was left undisturbed.

Twenty-five per cent of the bondholders having assented to the plan, it was submitted on February 15th to the Interstate Commerce Commission, which, on March 24th, approved it as presented. The re-spondent, Dancey, and those for whom he speaks, are the holders of about $400,000 par value of the bonds. They intervened before the Commission and objected to the plan on the ground that the bondholders were not to get a fair consideration for the extension. They asked that the payment of ten per cent should be raised to thirty per cent; that, in addition, the "portfolio" should be pledged with the trustee instead of liquidated by the "Road"; that the sinking fund payments should begin as of May 1, 1943, and not as of January 1, 1943; that the bonds be given a conversion privilege into shares; that the "Road" should continue to pay two-thirds of the net consolidated income into the sinking fund after the principal of the outstanding bonds had been reduced to $25,000,000; that the bondholders should be entitled to elect a director; and other subsidiary matters not necessary to mention. Before this court, they ask the same relief, except that they have reduced their demand for a cash payment from thirty per cent to twenty-five. Over eighty per cent of the bondholders have now assented to the plan; no one has objected but Dancey and his associates.

The current assets of the petitioner on March 31, 1943, were $20,947,754; the current liabilities $8,969,142; making the net current assets as of that date, $11,978,-612, and not including the "portfolio." (These liabilities included future payments extending until March 31, 1944, upon grade crossings $82,231, and equipment $1,359,-623.) If one carries forward these figures to May 1, 1943, some corrections are necessary; the net cash income for April was $808,189; from which must be deducted $54,143 spent for betterments and $342,032 —an unexpected installment paid upon nine locomotives. (Before March 31, 1944, the balance must be paid upon these locomotives—$199,800.) The result is a net increase of $212,214, making the net current assets $12,190,826. If the plan goes through, the "Road" must pay ten per cent of the outstanding bonds: i.e. $4,776,900, for which it will be entitled to use only half the expected liquidation value of the "portfolio" as of May 1—$4,116,015—making a further deduction of $660,885. Moreover, since the sinking payments will begin on January 1, 1943, there will be still another deduction of about $1,000,000, leaving net current assets of $10,537,439; $782,-476 above the net of $9,750,000 which the "Road" presented to the Commission as

its estimated quick assets as of April 30, 1943. We do not know that the Commission accepted this figure; it did not expressly find what were the necessary quick assets. These being the facts, the question arises whether we are justified in making those statutory findings upon which our approval depends.

In dealing with mortgages upon railroads or other large industrial plants, it is unreal to think in terms of payments in cash. "Whiteacre" can in normal times be sold in foreclosure for cash; there will be bidders whose competition will at times realize its full value, and will generally realize something approaching it. Not so upon the foreclosure of a railway or industrial plant; unless the mortgage is for a small amount, we may go through the form of selling, but we cannot really sell the property. Put to their remedies at common law, the bondholders have no alternatives but to take over and run the property themselves—usually the last thing they want— or to accept an "upset price"— an insignificant remnant. Thus, when a road proposes a plan of "adjustment" under Chapter XV, or under § 77, 11 U.S.C.A. § 205, it does not deprive the bondholders of the payment of their bonds; they have always known that, in the event of a default, if the mortgagor cannot refund, they must take possession of the property. Indeed, it was a recognition of this and of the abuses which resulted from persisting in the form of selling, and allowing the bondholders to rearrange their interests among themselves without judicial surveillance, that led to the passage of § 77 and of Chapter X of the Bankruptcy Law, 11 U.S.C.A. § 501 et seq., and of Chapter XV. Looked at practically, the bondholders therefore suffer nothing by the extension except two things: (1) The loss of their power, by making themselves owners of the "Road", to enjoy its net revenue; and (2) the loss of an immediate payment of so much of the quick assets as the Interstate Commerce Commission should decide was not necessary to insure the continued discharge of the "Road's" public duties. As to the first loss, the great bulk of the bondholders have indicated that they do not want to have thrust upon them the responsibility of operating the "Road". That may not be a final answer, but we shall see that they are put in very nearly as good a position as though they were operating it, and without the attending risks. As to the second, we think that they

are getting all the quick assets that can safely be spared—at least after the modification which we are making.

■ First then, as to the future income until the maturity of the bonds. The "Road" surrenders two-thirds of this, and in addition an amount equal to what may at any time be declared as dividends. That means that the shareholders can get only one sixth of the income until the mortgage has been reduced to $25,000,000. Thereafter, this payment is reduced to $500,000 —which, incidentally, is more than half the average net income after fixed charges for the years 1931-1942, inclusive. It does not seem to us that this is an unfair substitution in a case where the bondholders have not suggested that they wish to take possession. (Even the respondents apparently do not want that.) Moreover, while it may be true that the great majority of its shareholders do not interest themselves in the actual operation of the "Road", but hold their shares only as an investment, there must be a substantial part of them who watch the conduct of the managing officers. We have no reason to assume that the administration is irresponsible: i.e. left in the hands of those who have no stake in the enterprise. If not, it is most undesirable altogether to wipe out that stake, or to postpone it too long. Northern Pacific R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, demands nothing of the kind; and the plan certainly conforms to the admonition of § 725(3) which merely directs us somewhat vaguely to give "recognition to the rights of each class of creditors and stockholders and fair consideration to each class thereof adversely affected."

■ Next as to the quick assets. Here the first consideration, as we have said, is the minimum which safety requires for operation, an amount as to which the Commission's judgment should weigh heavily since it lies particularly within their expert acquaintance. Although their report did not fix any amount, the "Road's" computation as of April 30, 1943, showed $9,750,000 after the payments had been made. We must assume, we think, that the Commission approved this figure, and that the quick assets should not be reduced far below it. It is obvious that personally we have no experience which enables us to form an independent judgment on such an issue; we must be guided by the report, corrected by the testimony. The "Road's"

officers say that, in view of the uncertainties of the times, they do not believe that it is safe further to reduce their working capital; indeed, they go further; they say that it has become apparent, since the Commission approved the plan, that they will need more—an argument whose consideration we reserve for the moment. So far as concerns any reduction, we see no reason to challenge the officers' judgment. Certainly they are in a position to know, and, even though we assume—as we do—that they have a bias in favor of the shareholders, there is so little left for the shareholders anyway until the bonds are paid, that we should not discredit their opinion. Against them the respondents have produced only a single witness, who, whatever his other qualifications, had not the faintest shadow of actual experience in the operation of railroads. Indeed he did not profess to base his opinion upon experience. On the contrary, he resorted to the statistics to be found in accredited railway manuals, from which he computed averages of the ratios between net current assets and fixed charges, and net current assets and gross revenues of a number of roads. From these he deduced that the "Road" could safely afford a much higher cash payment—25% instead of 10%. It might be safe to infer from the range of such ratios that a given railroad should not exceed the limits on either side; but certainly the average, or mesne, was no guide whatever. We can safely use averages only when we are dealing in large numbers of instances, whose individual discrepancies will then cancel out; they tell nothing whatever about any given instance, and the deduction in this case was quite without foundation. We therefore accept the figure for quick assets which we are imputing to the Commission; and all that remains is to study how far what has happened since the first of this year requires any change.

As the figures we have given show, the only substantial increase up to May 1, 1943, was in the "portfolio"—$3,233,466. The question at once suggests itself why the whole, instead of only one half, of this increase should not go to the bondholders. To this the "Road" makes several answers. First, it says that the nine locomotives added over $500,000 to its expenses; second, that there has been a net wage increase of $200,000 for three months—say $800,000 a year; third, that its freight rates have been reduced by $1,500,000.

This makes a formidable total of $2,800,-000, and reduces the quick assets to $7,737,-439, even after crediting one half of the increase in the "portfolio" to the "Road"; and reduces them to only about $6,000,000 if all the increase goes to the bondholders. We are not however persuaded that in accepting the figure of $9,750,000, as a safe margin, the Commission did not take these factors into consideration. The nine locomotives were not a new and unexpected item; all that happened was that they were delivered considerably sooner than had been expected. If the "Road" were immediately short of cash, this might have been an embarrassment, but that was not the case. As to the freight reduction, surely the Commission must have known that it was likely, because it was the work of the Commission itself. The wage increase also —although in no sense so immediately within its control—could not have seemed to it improbable. Indeed, everybody knew that such increases were likely, and everybody knows that further increases are likely. On the other hand we cannot impute to the Commission forecasting the possibility of a rise in the value of the "portfolio." While their judgment relating to the operation of railroads should be of great weight with us, we see no reason to suppose that they are especially gifted in forecasting the course of market securities; even of railroad securities. More particularly we are not to suppose that they would attempt to make such a forecast, even if they supposed that they could do so; that would introduce into their duties an added speculative factor where enough speculation is inevitable. Judge Hulbert and I therefore believe that the increase in the "portfolio" above $5,000,000 should go to the bondholders; in so holding we think that we are in fact accepting the figure on which the Commission acted. We do not forget that under this ruling—quite aside from the three items we have considered—the actual quick assets will turn out to be less by a considerable sum than $9,750,000; but we believe that this results from chances which it is fair to assume that the Commission must have considered, when it approved the plan. We see no reason to suppose that three years will not be long enough to liquidate the "portfolio"; we disapprove of turning it over to the trustee for liquidation. Finally, we make no other change upon the understanding that the phrase, "consolidated net income," as used in the

plan and in the mortgage means that the income cannot be reduced by the deduction of any payments made by the "Railroad Corporation" to the "Company" for advances before 1942. Nobody has suggested the contrary, it is true, but we wish no doubt left on the score.

■ Judge Knox wishes to increase the payment from ten to fifteen per cent, but it seems to us more to the interest of the bondholders to have the sinking fund increased than to raise the payment by so little. Instead of regarding the increased power of the "Road" to use the sinking fund to buy in bonds at the market as an injustice to the bondholders, as the respondents argue, we think it a boon. The added payment would go a very short way to relieve a necessitous bondholder; far more to his advantage is a large fund which can be used only to purchase bonds. The mere existence of such a fund is a protection to those who must find an immediate market; and it is they who are most likely to need protection. We see no reason why this modification should go back to the Commission, or be referred again to the bondholders. We have stated our reasons for supposing that we are only carrying forward the plan as the Commission approved it; the change is not, we think, "substantial." The statute means to give us some latitude in this matter.

■ The respondents next suggest that the bondholders shall be given the right to convert their bonds into shares at a given figure. This seems to us unnecessary. Those who think that the "Road" will prosper, can always become shareholders by selling their bonds; to give them a "call" upon the shares, already transforms them contingently into shareholders; it allows them to become such if the venture prospers, without risk if it does not. They bargained for nothing of the kind; and, although it would give them a "hedge" against inflation during the period of the proposed extension, the possibility of inflation in 1963 is not among those events against which it seems to us fair to compel the "Road" to provide. No doubt, it would be a permissible provision in the plan; but in view of the other advantages offered, we cannot say that it was an essential one. Indeed, as we have said, except for the retention of one sixth of the income, the bondholders are beneficially already in the position of shareholders until the issue has been reduced by one half; and even thereafter to an appreciable extent. Nor can we see any basis for giving them a right to elect a director. The only ground which can be suggested is that the "Road" might not fairly compute the net income which is to be divided, or might be slack or imprudent in liquidating the "portfolio." All the doings of railroads are now so supervised and so public that it is hard to imagine that the bondholders should need this protection. Should they ever find themselves shut out from information, it would be time enough to consider what redress was open to them. At the present time to provide against that possibility appears to us out of proportion to the effect upon the "Road." The other objections do not require any discussion.

We are filing herewith our findings, as required by § 725, and an order approving the plan as modified. The fixing of allowances and all other incidental questions will be reserved, and may be brought on at the parties' convenience. It will be noted in the 29th finding that our approval is made contingent upon "corporate action" of the "Road" accepting the modification.

KNOX, District Judge (concurring in part).

With one exception, I am in entire accord with the conclusions of the majority of the Court. I feel that the payment presently to be made upon the outstanding bonds should be fifteen, instead of ten, per cent of the indebtedness. To my mind such payment would be beneficial—not only to the bondholders—but to the petitioners as well. In my judgment, their cash resources are amply sufficient to enable the increased payment to be made, and without detriment to the road. Certainly, I have no desire to cripple the efficient operation of a railway carrier. In my belief, railroads are the country's most necessary public utilities, and they should not unnecessarily be hamstrung.

Nevertheless, for years and years, debt has been the bane of railway existence. For reasons that to me are inexplicable, many managements are reluctant to reduce debt as and when they are able. To this reluctance, many of the ills that beset the nation's carriers can properly be attributed. But, be this as it may, a majority of the court has outvoted me on the amount of the principal payment now to be made. In view of this, a recapitulation of the figures that will support my views would be noth-

ing more than a gesture. I refrain from the effort of making it. I desire merely to add one comment.

Were the principal of the bonds to be reduced by a payment of fifteen percent, they would, with the additional security that the Court's decision affords them, enjoy a market value considerably in excess of going prices. In other words, the added value of the securities would be reflected in the market place. Holders desiring to sell their securities, instead of having to await the operation of the sinking fund—the establishment of which I favor—over the next twenty years would probably obtain higher prices for their bonds than will be possible under the decision of my colleagues.

For these reasons, I record a dissent from the decision of a majority of the Court.