**In re BALTIMORE & O. R. CO.**
No. 9905.

District Court, D. Maryland.

Nov. 20, 1945.

John J. Cornwell, of Baltimore, Md., Arthur H. Dean and DeLano Andrews (of Sullivan & Cromwell), both of New York City, Harry N. Baetjer and Hunter H. Moss (of Venable, Baetjer & Howard), both of Baltimore, Md., Russell Snodgrass, of Washington, D. C., and F. E. Bankhages, of Baltimore, Md., for petitioner.

Randolph Phillips, pro se.

H. C. Ackert and J. W. Giesecke (of Ackert, Giesecke & Waugh), both of St. Louis, Mo., for objectors Crozier et al.

Edwin S. S. Sunderland and James L. Homire, both of New York City, W. Meade Fletcher, Jr., of Washington, D. C., and Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City, for Reconstruction Finance Corporation.

Walter Pond, of New York City, for Bank of Manhattan Co., trustee.

F. W. Doolittle, Jr. (of Rathbone, Perry, Kelley & Drye), of New York City, for Central Hanover Bank & Trust Co., trustee.

Eben E. Rand (of Mitchell, Capron, Marsh, Angulo & Cooney), of New York City, for City Bank Farmers Trust Co., trustee.

E. Sheldon Stewart, of New York City, for U. S. Trust Co. of New York, trustee.

George Ross Veazey, of Baltimore, Md., for Bankers Trust Co., trustee.

Samuel G. Kling, of Baltimore, Md., for George H. Phillips.

Before SOPER and DOBIE, Circuit Judges, and CHESNUT, District Judge.

CHESNUT, District Judge.

This petition for a railroad adjustment under Chapter XV of the Bankruptcy Act, 11 U.S.C.A. § 1200 et seq., is a sequel to In re Baltimore & Ohio Railroad Co., D.

C., 29 F.Supp. 608, certiorari denied Getz v. Baltimore & O. R. Co., 309 U.S. 654, 60 S.Ct. 470, 84 L.Ed. 1003; Id., 309 U.S. 697, 60 S.Ct. 709, 84 L.Ed. 1036. In that earlier case this court (a three-judge court) approved the B and O's 1938 plan for an adjustment of its securities under Chapter XV of the Bankruptcy Act then in force. That Act expired by limitation on July 31, 1940, but was re-enacted by the Act of October 16, 1942, c. 610, 56 Stat. 787, 11 U.S.C.A. (ss. 201 to end) §§ 1200–1255; but by its terms is limited in duration to November 1, 1945, except in respect of any proceeding thereunder theretofore filed.

The chief characteristic of the 1938 plan was an eight year moratorium for the payment of interest charges on certain of the Railroad's bond issues. The dominant feature of this second plan is the extension of maturity dates for certain bond issues aggregating in principal amount $495,799,164. The 1938 plan, after approval by the court, has proven successful in that it avoided a receivership and drastic reorganization of the Railroad under section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, and since 1941, all current and accumulated interest has been paid by the Railroad on all its securities; and in accordance with that plan, the Company has retired over $100,000,000 par value of its capital obligations with consequent reduction of over $5,500,000 of annual interest charges. One feature of the financial embarrassment of the Railroad in 1938 was its then existing obligation in the amount of $72,771,578.44 due to the Reconstruction Finance Corporation for loans previously made and maturing in 1939–1942, secured by a large amount of collateral, and a $50,000,000 note issue (of which the R.F.C. held $13,490,000), likewise maturing in 1939. One of the adjustments made by the 1938 plan was a five year extension of maturity of these obligations with the consent of the R.F.C., until November 8 and August 1, 1944 respectively. Although the 1938 plan was to be generally effective for eight years the R.F.C. was unwilling to postpone the maturity of the debts due to it for a longer period than five years. As the law then stood they could not extend beyond January 31, 1945. 49 Stat. 2, now amended, see 15 U.S.C.A. § 605m.

Particular consideration was given in the hearings on the 1938 plan to the possible or probable effect that these large 1944 maturities would have on the successful working out of the plan. It was realized that the obligations would have to be met either from excess earnings (which seemed improbable) or from successful refunding or otherwise; and the court concluded from the evidence submitted that there was a reasonable prospect for the successful refunding of the 1944 maturities through an anticipated increase in earnings with a consequent increase in market values of the securities (including $102,000,000 of B and O Refunding Bonds) constituting the collateral pledged for the loans. Prior to this second plan the B and O paid off all the $50,000,000 secured note issue, except the $13,490,000 held by the R.F.C. The latter was then consolidated with the other debts due the R.F.C., all secured by collateral.

The anticipated enhancement in value of the collateral did in fact occur to a very substantial extent. On June 15, 1938, the market value of the collateral was $52,000,000; on November 15, 1939, shortly after the approval of the 1938 plan, it increased to $85,000,000; on September 17, 1944 (just before the date of announcement of this second plan) it had increased to $128,000,000, and on September 6, 1945, it had increased to $172,000,000. But despite this substantial increase in market value the evidence in this case shows that it was not financially possible in 1944 for the Railroad to refund the indebtedness to the R.F.C., nor would it be possible even now, in the absence of the approval of the present plan, to refund the amount by sale to the public of notes secured by this collateral.

The reason lies in the nature of the collateral. The principal items of value were $102,000,000 of B and O Refunding Bonds and large amounts of the stocks of the Reading and Western Maryland Railroads, through which the B and O had vitally important operating arrangements. The sale of these stocks would have been disastrous to the B and O and very prejudicial to the holders of its securities affected by the present plan. The market value of these Refunding Bonds in 1939 was in the 30's. It was anticipated that with the approval of the plan and the return of normal traffic conditions, the market value of these bonds would be greatly increased. But while there was some substantial appreciation the market value did not increase

anything like so much as had been reasonably anticipated despite substantial increased net earnings. This was apparently due to two factors: (1) the uncertainty as to whether the Railroad would be able to successfully refund its heavy maturities of about $300,000,000 to occur in 1944, 1948, 1950 and 1951, and (2) probably because the investing public had become more critical with respect to railroad securities by reason of the large number of railroads then in receivership or in process of reorganization in bankruptcy. This public attitude seems to have been induced largely by the policy of the Interstate Commerce Commission with respect to new capitalizations of railroads, in insisting that the ratio of fixed charges to net income should be much lower than had been customary in railroad financing in earlier years.[1]

In this situation, after unsuccessful efforts to refund the 1944 maturities through public marketing, the management of the Railroad early in 1944 conferred with Mr. Jesse Jones, then Secretary of Commerce and Federal Loan Administrator and the former Chairman of the Reconstruction Finance Corporation, who had given special personal attention to railroad loans, and who still had supervisory authority in the R.F.C., to ascertain whether the R. F.C. would further extend the maturity of the 1944 obligations and if so, on what conditions. The Railroad was advised that no extension would be made unless it could successfully secure a substantial extension of maturities of its large bond issues, maturing in 1948, 1950 and 1951. Despite this previously expressed attitude of the R.F.C. it appears that some of the officers of the Railroad were uncertain whether the refusal to extend the 1944 maturities except on the conditions indicated, was final and unalterable. Thereupon arrangements were made for a formal conference with Mr. Jones upon the subject at his office in Washington on May 12, 1944. At that conference attended by Mr. Jones and other members or representatives of the R.F.C., Mr. White, president, Mr. Snodgrass, financial vice president, and Mr. Clay, General Solicitor, and several Directors of the B and O, Mr. Jones definitely and finally refused to further extend the loans except on the stated conditions. In consequence thereof the Railroad then proceeded to formulate the present adjustment plan, after conference with members of the legal staff of the R.F.C., and financial officers of some of the large institutional holders of B and O bonds.

A railroad adjustment under Chapter XV is much preferable to more drastic reorganization under section 77 of the Bankruptcy Act, if the petitioner can meet the requirements of Chapter XV. One important advantage of the procedure under Chapter XV is that it is generally terminated one way or the other within a relatively short time of about a year after the formulation of the plan, as compared with the much longer periods of possibly five or even ten years not infrequently required under section 77. To comply with the conditions of Chapter XV the railroad must, after formulating the plan, first obtain the voluntary assents thereto of 25% in amount of the claims of affected creditors; and thereafter it must obtain the approval of the plan and the necessary authority for the issuance of new or modified securities by the Interstate Commerce Commission, all before the plan is submitted for approval by the three-judge court.[2]

---

[1] In 1939, when the hearing was held on the 1938 plan, Mr. Daniel Willard was president and Mr. George M. Shriver senior vice president of the B and O. Both are now deceased. It is not even suggested by any one in this case that the testimony of these two respected former officers of the B and O at the hearing on the 1938 plan was other than in entire good faith and sincere belief as to future market conditions. Mr. Shriver was particularly acquainted with railroad financing based on his long experience in that field. His optimism as to the future was doubtless influenced by his experience in the past, when railroad financing was on a more favorable basis than at present. Even so late as 1930 he had been able to market for the B and O a more than $60,000,000 issue of thirty-year Convertible Bonds at 95, though not secured by liens.

[2] By section 1210 the approval of the Commission must include the following specific findings:

"(a) that such corporation is not in need of financial reorganization of the character provided for under section 205 of this title;

"(b) that such corporation's inability to meet its debts matured or about to mature is reasonably expected to be temporary only; and

"(c) that such plan of adjustment, aft-

After these conditions have been met the railroad must secure assents to the plan, or any modification thereof made by the Commission as a condition of its approval, from creditors holding more than two-thirds of the aggregate amount of the claims affected, which two-thirds shall include at least a majority of the aggregate amount of the claims of each affected class; and thereafter it may file its petition for the approval of the plan by the court in the district where it has its principal office, averring in the petition that it is unable to meet its debts matured, or about to mature, and desires to carry out the plan of adjustment, and annexing thereto a copy of the order obtained from the Commission. Section 1213 provides for the convening of a three-judge court to act on the petition.

The petitioner in this case has complied with these conditions precedent.[3] The three-judge court was duly convened and after two days' hearing (July 10 and 11, 1945) held after notice thereof, at which much evidence was submitted, entered an order approving the petition as properly filed in good faith and setting the case for final hearing, after due notice to all parties in interest, on September 17, 1945; but giving leave for further consideration of the issue of good faith on the final hearing.[4] The final hearing on the plan was held pursuant to notice (September 17–21) and the extended evidence submitted has been considered by the court.

The Baltimore and Ohio Railroad is the oldest railroad in the United States, having been chartered by the State of Maryland in 1827. It has been in continuous and generally successful operation for more than 100 years and by gradual growth and extension of operations from time to time is now one of the great railroad systems of the country. Its financial structure and the territorial extent of its operations were fully described in the prior case in this court. 29 F.Supp. 608. The system extends from New York through Philadelphia and Baltimore to Washington and thence westwardly through Pittsburgh and Cincinnati to St. Louis and to Chicago, with lateral branches to Cleveland and Buffalo. It operates more than 6,000 miles of road. The aggregate par value of its capitalization in bonds and stock, including subsidiaries, exceeds $1,000,000,000. Its continued successful operation is a matter of vital concern not only to the holders of hundreds of millions of its bonds, but also for the public interest and convenience.

The principal features of the adjustment plan now submitted, in addition to the refunding of the notes held by the R.F.C. in the amount of $82,393,114, consist in the extensions of the maturity of five of its large bond issues and in providing that

---

er due consideration of the probable prospective earnings of the property in the light of its earnings experience and of such changes as may reasonably be expected—

"(i) is in the public interest and in the best interests of each class of creditors and stockholders;

"(ii) is feasible, financially advisable, and not likely to be followed by the insolvency of said corporation, or by need of financial reorganization or adjustment;

"(iii) does not provide for fixed charges (of whatsoever nature including fixed charges on debt, amortization of discount on debt, and rent for leased roads), in an amount in excess of what will be adequately covered by the probable earnings available for the payment thereof;

"(iv) leaves adequate means for such future financing as may be requisite;

"(v) is consistent with adequate maintenance of the property; and

"(vi) is consistent with the proper performance by such railroad corporation of service to the public as a common carrier, will not impair its ability to perform such service."

[3] In the course of the pendency of the plan before the I.C.C. some amendments in detail of the new proposed securities were made and have been assented to by the requisite percentages of claims affected by the plan.

[4] The three-judge court as originally convened consisted of Judges John J. Parker, Senior Circuit Judge for the 4th Circuit; and Armistead M. Dobie, Circuit Judge for the 4th Circuit, and W. Calvin Chesnut, District Judge for Maryland. Subsequently Judge Parker withdrew from further participation in the case by reason of his appointment as an alternate member of the International Military Tribunal by the President of the United States, and Circuit Judge Morris A. Soper of the 4th Circuit was substituted in Judge Parker's place without objection from any party in interest. All the evidence submitted at the July hearing (and reintroduced at the final hearing) had been read by Judge Soper before the September hearing.

a certain portion of fixed interest on some of the issues be made payable only contingently upon earnings sufficient therefor, but to be fully cumulative until finally fully paid. The plan contemplates that the security for existing obligations of the Company remain unchanged. The following schedule shows the aggregate amount of each class of all the claims affected by the plan and the proposed adjustment thereof:

The plan also contains carefully worded provisions for (1) the determination and allocation of available income for the payment of fixed charges and for contingent interest; (2) for creation of a capital fund for capital investments and betterments; and (3) for sinking funds for the partial retirement of indebtedness; and (4) for certain restrictions on payments of dividends on the stock of the Company

| Class | Description | Principal amt. outstanding | Adjustment proposed in plan |
|---|---|---|---|
| 1 | Secured notes, matured Aug. 1, 1944, & November 8, 1944 | $ 82,393,114 | Extended to 1965 by refunding |
| 2 | First Mortgage, 4% Bonds, due July 1, 1948 | 76,922,350 | Extended to July 1, 1975 |
| 3 | First Mortgage, 5% Bonds, due July 1, 1948 | 67,826,500 | Extended to July 1, 1975, 1% unsecured interest to be contingent but cumulative |
| 4 | Southwestern Division Bonds, due July 1, 1950 | 37,285,500 | Extended to July 1, 1980, 1-1/2% unsecured interest to be contingent but cumulative |
| 5 | Pittsburgh, Lake Erie & West Virginia Bonds, due Nov. 1, 1951 | 36,798,000 | Extended to Nov. 1, 1980 |
| 6 | Toledo-Cincinnati Division 4% Bonds, Series A due July 1, 1959 | 10,028,700 | Extended to July 1, 1985 |
| 7 | Refunding and General Mortgage Bonds (see note) | 122,639,000 | |
| 8 | Thirty year 4-1/2% Convertible Bonds, due February 1, 1960 | 61,906,000 | Extended to Feb. 1, 2010, 4-1/2% unsecured interest to be contingent but cumulative |
| | | $495,799,164 | |

NOTE: The Refunding and General Mortgage Bonds are outstanding in four series as follows:

| | | |
|---|---|---|
| Series A, 5%, due December 1, 1995 | 48,989,000 | After 1946 Interest on A.D.& F. to be 2% fixed and 3% secured contingent; and C to be 2-2/5% fixed and 3-3/5% secured contingent |
| Series C, 6%, due December 1, 1995 | 29,218,500 | |
| Series D, 5%, due March 1, 2000 | 22,390,000 | |
| Series F, 5%, due March 1, 1996 | 22,041,500 | |
| | $122,639,000 | |

and (5) other miscellaneous provisions.[5] If the plan is consummated the B and O will cancel $6,350,650 of several bond issues now in the treasury.

Section 1225 of Chapter XV of the Bankruptcy Act (which is set out in the margin) [6] prescribes in detail the findings to be made by the special court as a con-

[5] Article III of the plan provides that "available income" shall be determined in each year by deducting from the "income available for fixed charges" all fixed interest and similar charges including interest on bonds bearing contingent interest which have become a fixed obligation by reason of maturity of the bonds to which it pertains. The available income so ascertained is allocated for application in the following order:

1. A capital fund of $5,000,000 or 2-½% of total railway operating revenues, whichever is greater, less depreciation (other than of equipment) charged against income, plus any deficiency in available income for the preceding calendar year;

2. A sinking fund payment of one-half of 1% of the aggregate of outstanding bonds affected by the plan (except the Refunding and Convertible Bonds) plus the amount of deficit, if any, in such payments for prior years. This amount will be increased if so-called Emergency Bonds are issued and outstanding under certain conditions;

3. The remaining available income to be applied to the payment pro rata of *secured contingent* interest still unpaid;

4. Then to the payment pro rata of *unsecured contingent* interest still unpaid;

5. Next, to a further sinking fund payment of 50% of the then remaining balance provided that when System charges for fixed and contingent interest are less than $22,000,000 this sinking fund payment need not exceed $750,000;

Article VII of the plan provides for additional payments into the sinking fund equal to the amount of any dividend paid on the stock of the Railroad in any year until the System charges for interest and guaranteed dividends (on stock of leased lines) do not exceed $20,000,000.

[6] Section 1225 (11 U.S.C.A.)

"§ 1225. Approval and confirmation of plan; requisites.

"If the special court shall find—

"(1) that, at the time of the filing of said petition as provided in subchapter III hereof, the proposed plan of adjustment had been assented to by not less than two-thirds of the aggregate amount of all claims of the petitioner affected by such plan, including at least a majority of the aggregate amount of claims of each such class;

"(2) that the plan of adjustment as submitted or as modified by the court has been accepted as submitted or, if modified, then as modified by or on behalf of creditors affected by such plan holding more than three-fourths of the aggregate amount of the claims affected by said plan, including at least three-fifths of the aggregate amount of the claims of each affected class;

"(3) that the plan meets the requirements of clause (c), and the petitioner meets the requirements of clauses (a) and (b) of subparagraph (2) of the first sentence of section 1210 of this title, and that the plan is fair and equitable as an adjustment and as such will: (a) afford due recognition to the rights of each class of creditors and stockholders and fair consideration to each class adversely affected and (b) will conform to the law of the land regarding the participation of the various classes of creditors and stockholders: Provided, That in making the findings required by this clause (3), the court shall scrutinize the facts independently of the extent of acceptances of such plan, and of any lack of opposition thereto, and of the fact that the Commission, under section 20a of title 49, has authorized the issuance or modification of securities as proposed by such plan, and of the fact that the Commission has made such or similar findings;

"(4) that all corporate action required to authorize the issuance or modification of securities pursuant to such plan shall have been duly taken either before or since October 16, 1942;

"(5) that the petitioner has not, in connection with said plan or the effectuation thereof, done any act or failed to perform any duty which act or failure would be a bar to the discharge of a bankrupt, and that the plan and the acceptance thereof are in good faith and have not been made or procured by any means, promises, or acts forbidden by this title;

"(6) that, after hearings for the purpose, all amounts or considerations directly or indirectly paid or to be paid by or for the petitioner for expenses, fees, reimbursement, or compensation of any character whatsoever incurred in connection with the proceeding and plan, or preliminary thereto or in aid thereof, together with all the facts and circumstances relating to the incurring thereof, have been fully disclosed to the court so far as such amounts or considerations can be ascertained at the time of such hearings, that all such amounts or considerations are fair and reasonable, and to the extent that any such amounts or considerations are not then ascertainable, the

dition to the approval of the plan. The more important of these findings in the instant case are (1) that the plan has been approved by creditors affected thereby who hold more than three-fourths of the aggregate amount of the claims affected by the plan, including at least three-fifths of the aggregate amount of the claims of each affected class; (2) that the plan is fair and equitable as an adjustment and as such will afford due recognition to the rights of each class of creditors and stockholders and is fair to each class adversely affected; and (3) that the plan is feasible. This section also makes it the duty of the court in the findings to be made to scrutinize the facts *independently* (1) of the extent of acceptances of the plan and any lack of opposition thereto, and (2) of the fact that the Commission has authorized the issuance or modification of securities as proposed by the plan and (3) of the fact that the Commission has made such similar findings. It is further provided in the section that the court shall file an opinion setting forth its conclusions and the reasons therefor and shall enter a decree confirming the plan which shall be binding upon the petitioner and all creditors and security holders of the petitioner.

In the decree to be entered in this case there will be included the detailed findings of fact which we have made thus in-dependently after consideration of the plan and the evidence in the case. In view of these separate findings, we find it unnecessary to here discuss in meticulous detail each and all of the findings and will, therefore, limit this opinion to our conclusions and the reasons therefor with regard to the fairness and feasibility of the plan generally, and to a discussion of certain matters which relate to the question of whether the plan is fair and equitable to the different classes of creditors affected and particularly to the holders of Convertible Bonds mentioned in the plan; and to certain modifications of the plan suggested by one or more of the intervenors in the case. We find the plan has been accepted by the holders of 81% of all the securities affected and by more than three-fifths of each class, the percentages thereof ranging from 86% to 67%.

*Consideration of Fairness of the Plan.* In appraising the nature and effect of the plan with respect to whether it is fair and equitable, it is important to give due weight to certain financial and economic facts affecting railroad securities which have been emphasized in the experience of preceding years. The recent war has clearly demonstrated the vital importance of the continued efficient operation of the railroads in our national life; and they will continue to be necessary in times of peace.

---

same are to be so disclosed to the court when ascertained, and are to be subject to approval by the special court as fair and reasonable, and except with such approval no amounts or considerations covered by this clause (6) shall be paid; and—

"(7) that the provisions of section 1222, 1236, and 1237 of this chapter have been complied with.

"Said court shall file an opinion setting forth its conclusions and the reasons therefor and shall enter a decree approving and confirming such plan and the adjustment provided thereby, which decree shall be binding upon the petitioner and upon all creditors and security holders of the petitioner; and thereafter the petitioner shall have full power and authority to and shall put into effect and carry out the plan and the orders of the special court relative thereto and issue the securities provided by the plan without further reference to or authority from the Commission or any other authority, State or Federal, except where required by any law relating to the Reconstruction Finance Corporation, and the rights of all creditors and security hold-ers with respect to claims and securities affected by the plan shall be those provided by the plan as so approved and confirmed: Provided, however, That the title of any owner, whether as trustee or otherwise, to rolling-stock equipment leased or conditionally sold to the petitioner, and any right of such owner to take possession of such property in compliance with the provisions of any such lease or conditional sale contract, shall not be affected by the provision of this chapter.

"No plan shall be approved under this chapter unless the special court finds that with respect to the continuation of, or any change in, the voting rights in the petitioner, control of the petitioner, and the identity of, and the power and manner of selection of the persons who are to be directors, officers, or voting trustees, if any, upon the consummation of the plan and their respective successors, the plan makes full disclosure, is adequate, equitable, in the best interests of creditors and stockholders of each class, and consistent with public policy."

It is essential that they be continued in efficient management and operation as going concerns. It is highly important both to the holders of their securities and in the public interest that court receiverships or drastic reorganizations should be avoided if possible. If a railroad is unable to meet its debts as they mature, then, to keep them going concerns, receivership or reorganization is unavoidable unless there can be a successful adjustment under Chapter XV.

One lesson that has been learned in the recent past is that in the capitalization of a railroad its fixed charges for interest should be substantially less in amount than its average net earnings; and this has been the policy approved by the Interstate Commerce Commission in many of the railroad reorganizations under section 77 of the Bankruptcy Act. The Baltimore and Ohio Railroad has had a continuous growth for more than a century. Numerous extensions of its System have added greatly to its capital indebtedness and at the present time the aggregate amount of the latter is unfortunately large (about 60% of its total capitalization including its subsidiaries). However, its present financial embarrassment is not due to lack of earning capacity to meet all its interest charges but to principal maturities which cannot be successfully refunded under present conditions in the absence of some further adjustment of its capital obligations.

For more than fifty years all our interstate railroads have been subject to very firm governmental control administered principally by the Interstate Commerce Commission. Railroad rates for transportation of goods and passengers have for many years been fixed or controlled by the Commission at rates deemed reasonable but seldom affording more than a very moderate return on property devoted to the public service. It is practically impossible for railroads to carry to surplus from year to year sums sufficient in the accumulated aggregate to pay off in cash large sums of the maturing principal of capital indebtedness. Successful refunding thereof is ordinarily the only alternative to receivership or reorganization.

Another fact which must be realized by the holders of railroad securities is that the payment of interest to them is practically contingent upon the net earnings of the railroad. Legal redress for satisfaction of the debts due them through mortgage foreclosures almost inevitably results in very substantial loss, either in a long moratorium in the payment of interest, or in the total loss of income for many years, or in the impairment or reduction of their capital investments in case of receivership or drastic reorganization. On the other hand, especially under present financial and economic conditions, the time of maturity of the principal of their investments is much less important than the successful maintenance of payment of accruing interest from earnings. It is a well known financial fact that where the net earnings of the railroad are amply sufficient to meet all fixed charges, the market price of railroad securities is generally sufficiently high to enable security holders to realize upon their investment even when originally made at high prices, by sale in the market. It is therefore obviously of advantage to them if the railroad can avoid receivership and continue to operate with sufficient net earnings.

Still another fact to be realized by investors is that net earnings depend very largely on good management. Unless the courts intervene through receivership or reorganization, management is elected and controlled by the stock interests in the railroad. They should have some incentive to maintain good management. The market prices for the stock and the prospect of dividends furnish this common incentive. While reasonable restrictions on the payment of dividends is thoroughly desirable, restrictions so drastic that they remove the incentive to good management impair the value of all the railroad securities. Conversely, it is a well known financial fact that where the common stocks of a railroad have substantial market value, this manifested public confidence in the railroad's prosperity sympathetically tends to enhance the market value of its bonded indebtedness.

■ Against this background of economic and financial experience, a study of the main features of the present plan, and its particular impact on the several classes of affected securities, leads us to the conclusion that the plan as a whole is fair and equitable. There is much affirmative evidence in this case to this effect.

The plan does not reduce the principal amount of the capital debt or the obliga-

tion of the Railroad for the full interest contracted for thereon, nor does it impair any of the present security for the several affected issues respectively. It merely *postpones* the maturities of the obligations for the principal, and possibly some of the interest thereon. With respect to the latter, it does not release the railroad from its absolute obligation eventually to pay all that has been contracted for, although some portion of the original contract rates is made contingent as to time of payment, dependent upon the sufficiency of current net income. Upon maturity of the principal as deferred or as accelerated unpaid contingent interest becomes a fixed obligation, and all currently deferred interest is fully cumulative.

The plan also provides a substantial sinking fund [7] for the partial retirement of capital obligations. And to keep the railroad a going, and if desirable an expanding, concern, it provides for the setting apart from annual earnings a substantial "capital fund" for betterments, and if necessary and advisable (under restrictions) for the issuance of additional bonds for capital improvements, and also, under some rigid restrictions, for the issuance of temporary Emergency Bonds for similar purposes. Provision is also made in the modified indentures for *refunding* of many of the new bond issues to the extent not previously retired, through the sinking and other funds. These conditions make for flexibility and are reasonable assurance for the continued prosperity of the railroad as a going concern in meeting possible new conditions as they arise in the future.

A number of financial experts have submitted oral testimony in support of the fairness of the plan from the standpoint of the security holders. Among those who testified to this effect were Mr. Charles S. Garland, a member of the long established and well known banking firm of Alex. Brown & Sons of Baltimore; Mr. John Stedman, vice president of the Prudential Insurance Company, whose Company holds over $7,000,000 par value of several of the affected bond issues and holds $540,000,000 of all railroad securities; Mr. Harry C. Hagerty, vice president of the Metropoli-

tan Life Insurance Company which holds $28,000,000 of B and O Bonds, including substantial amounts of all the affected issues with the exception of the Convertibles, and also 6900 shares of B and O preferred stock; and Mr. Arthur Knies, a financial expert on railroad securities. It is also relevant to note that Moody's well known rating manual has classified each of the affected classes of securities higher, if the plan is approved, than the rating which it previously has had. It is also, we think, quite significant to note the very substantial rise in market prices of each of the affected classes of securities since the announcement of the present plan. No doubt general conditions affecting all railroads are a considerable factor in this market rise; but it has been specially pronounced with respect to the B and O securities since the announcement of the present plan, and proportionately much greater than the average of similar increases for other railroads as shown by the well-known Dow-Jones statistics for second-grade securities.[8] Thus on September 19, 1944 (the day before the public announcement of the plan) the market price for B and O 4's was 88; on December 4, 1944, it was 95⅞ and on July 12, 1945, it was 106. And there have been even greater proportionate market advances in other issues affected by the plan. The most pronounced and proportionate increase in market price has occurred in the case of the B and O Convertible Bonds which on September 19, 1944, was 37, but rose to 72½ on July 12, 1945. Since then and doubtless consequent upon the termination of the war with Japan, there has been some slight market recession in all the affected issues. This very substantial rise in market prices of B and O securities is at least very weighty evidence that public confidence has been greatly increased in the continued prosperity of the B and O Railroad as a result of the announcement of the plan and of its progress toward being put into effect. It is, of course, not determinative of the fairness of the plan for this court and it has not been so regarded by us.

■ Although the court is enjoined to consider the fairness of the plan inde-

---

[7] Schedule 3 annexed to the plan shows the estimated amounts payable into the sinking fund, based on the average annual net earnings of previous periods. The amounts are, for 1921–1927, $9,386,323; for 1928–1934, $8,204,932; for 1935–1941, $3,841,472; and for 1942–June 1944, $17,-408,830.

[8] See Petitioner's Exs. Nos. 99, 99a and 99b.

pendently of the percentages of acceptances by security holders, or lack of opposition therefrom, it is relevant to note how largely and widely the plan has been approved by the security holders of all affected classes. The holders of over 81% of the aggregate principal of all affected securities have affirmatively voted assent to the plan. Less than 1% have affirmatively dissented. Of the whole number of individual holders (less than 80,000), 39,738 have voted for the plan and only 103 against it, a percentage of over 99% for the plan and less than one-third of 1% against the plan, of those voting on it. The percentages of assents to the plan by holders of the several affected classes range from 86% to over 67%, excluding the R.F.C. as holder of the securities pledged as collateral for its loan. It has fully assented to the plan.[9] The only intervenors in this case as objectors to the plan are listed in the margin.[10]

 *The Feasibility of the Plan.* Section 1225 of the Act requires (among other things) as a condition of our approval, that we find that the plan meets the requirements of clause (2), sub. (c) of section 1210. As previously noted, section 1210 outlines the findings that must be made by the Interstate Commerce Commission and we are enjoined to make our findings independently of the Commission's report. As previously indicated, we will make these findings in the decree in this case. We think it necessary in this connection to particularly discuss only those parts of the clause which relate to the findings of *feasibility* of the plan. To approve the plan it is necessary that it be found feasible, financially advisable, and

not likely to be followed by the insolvency of the Railroad, or by need of further financial reorganization or adjustment; that it does not provide for fixed charges in an amount in excess of what will be adequately covered by the probable earnings available for the payment thereof; leaves adequate means for such future demands as may be requisite and is consistent with adequate maintenance of the property and consistent with proper performance by said railroad corporation of service to the public as a common carrier and will not impair its ability to perform such services. We have given careful consideration to the particular matter of the feasibility of the plan; that is, its probable success in the continuation of the Baltimore and Ohio Railroad as a going concern. We have thought it particularly important to do so in this case by reason of the fact that contrary to reasonable expectation there has been necessity for this present plan as an aftermath of the 1938 plan. It has been said in opposition to the present plan that the 1938 plan failed, and therefore the Railroad should not be entitled now to further aid by the court's approval of this present plan. But this criticism of the effect of the 1938 plan is superficial and literal rather than substantial. The 1938 plan has been highly successful in the interest both of the public and of the security holders in that the Railroad thereby escaped what otherwise would have been inevitable receivership or drastic reorganization. As a result of the plan the Railroad has been maintained as a going concern under private management, has proved its great worth to the public during the recent war, and since 1941 has fully met and paid all its fixed and contingent

---

[9] See Petitioner's Ex. No. 102. The exact number of individual bondholders does not appear. From Petitioner's Ex. 72 it appears that the B and O had a mailing list of 80,000; but this number was larger than the total actual number at any one time as it included the names of prior holders who had transferred their bonds.

[10] There are only a few intervenors in this case who oppose the plan either in toto, or in the alternative suggest modification. They are (1) George H. Phillips, the holder of an unspecified number of Convertible Bonds; (2) Jane Crozier, Roberta Giesecke and Harriet M. Ackert, holders of $5,000 Refunding 5's due 1996, and $1500 1st. Mtge. 5's due 1948; (3) Alfred

M. Darlow, a former employe of the B and O whose petition for intervention states (without other proof) that he is the holder of $37,000 par value of various issues of the 1st. Mtge. Bonds, and Refunding 5's; (4) Charles M. Merwin, the holder of an unspecified number of Refundings and (5) Randolph Phillips, the holder of a one-third interest in $100,000 par value of Convertibles. None was represented or participated in the hearing except Randolph Phillips (pro se) and Crozier, Giesecke and Ackert, who were represented by counsel. The latter did not oppose the plan as a whole but do suggest certain modifications which will be later noticed.

interest charges. It is true that the Railroad is again in need of financial adjustment under Chapter XV; but it seems clear on the evidence that its present embarrassment is due not at all to lack of earning capacity but to present inability to refund maturing principal obligations. The 1938 plan has been criticized because it did not foresee and successfully provide for this present situation. Of course as the event has proved, it would have been wiser if it had done so. But it should be remembered that the B and O 1938 plan was the first case under Chapter XV.[11] At the time it was a novel and bold venture for the railroad to obtain voluntary assents to the plan by the requisite percentage of its security holders affected thereby. It may be doubted whether the more comprehensive plan now proposed could have been successfully consummated. The plan has proven insufficient only in the one respect, that it did not include the extension of the maturities now provided for in this supplemental plan. We think the present plan should be considered on its intrinsic merits without prejudice resulting from the adverse comment that the 1938 plan was not sufficiently comprehensive.

So considered, we reach the conclusion that the plan is financially advisable and feasible. So far as it is humanly possible to foresee the economic and financial conditions of the future, the adjustment now proposed is not likely to be followed by the insolvency of the Railroad or by the need of further reorganization or adjustment. As already pointed out, the present embarrassment is not from lack of sufficient earning capacity to meet the current interest charges, but only inability to refund capital maturities. The current aggregate amount of all fixed charges and contingent interest payments including guaranteed dividends on leased lines stocks (as of August 31, 1944) is less than $27,000,000. By the present plan the annual fixed charges and guaranteed dividends on leased lines will be about $19,000,000, and the contingent current interest about $8,000,000. The Baltimore and Ohio income available for fixed charges, from 1921 to the present time, has been annually substantially more than sufficient to meet all the present aggregate interest charges both fixed and contingent under the plan, with the exception of the one year of 1938. In no year in this period, except 1932 and 1938, has the income for charges been less than $28,000,000, and the average income for the whole period has been about $40,000,000. From 1921 to 1927 the average was over $46,000,000; from 1928 to 1934, over $42,000,000; from 1935 to 1941, nearly $34,000,000, and from 1942 to 1944 inclusive, over $64,000,000. In estimating future earnings we should of course disregard the high earnings during the war period; but even in the years of economic depression, from 1935 to 1941, the average net income was nearly $34,000,000. We are also not unmindful that railway operating expenses have been largely increased in the last two or three years by reason of increase in wages and taxes, but it does not seem probable for the foreseeable future that the net income will be less than $27,000,000; and even more improbable that it will be less than the total fixed charges under the plan of about $19,000,000.[12]

In our opinion the plan contains provisions sufficiently flexible to meet such future financing as may be requisite. In addition to the sinking fund for the partial retirement of bonds, it provides that upon maturity the outstanding bonds may be refunded, and also provides a minimum capital fund of $5,000,000 annually (after payment

---

11 Subsequently other railroads in temporary financial distress have successfully petitioned for securities adjustments under the Act. In re Lehigh Valley R. Co., D.C., 34 F.Supp. 753; Ewen v. Peoria & Eastern R. Co., D.C., 34 F.Supp. 332, certiorari denied 311 U.S. 700, 61 S.Ct. 138, 85 L.Ed. 454; In re Peoria & E. R. Co., D.C., 37 F.Supp. 917, certiorari denied Ewen v. Peoria & E. R. Co., 314 U. S. 635, 62 S.Ct. 69, 86 L.Ed. 510; Id., D.C., 49 F.Supp. 83; In re Wichita Falls & Southern R. Co., D.C., 30 F.Supp. 750, certiorari denied Steelman v. Wichita Falls

& S. R. Co., 309 U.S. 687, 60 S.Ct. 889, 84 L.Ed. 1030; In re Midland Valley R. Co., D.C., 51 F.Supp. 180; In re Montana W. & S. Co., D.C., 32 F.Supp. 200; Delaware & Hudson R. Corp. et al. v. Dancey, D.C., 51 F.Supp. 763. In most of these cases the approved adjustments included substantial extensions of maturities of principal obligations; and in one reduction of fixed charges by making payment of them contingent upon sufficient earnings.

12 See schedules 1, 2, 3 and 4 annexed to the plan, Petitioner's Ex. No. 1.

of fixed interest) for capital betterments, and provides for the issuance of additional bonds to finance 75% of additions to property covered by several of the respective new mortgages, and, in addition, a limited amount of Emergency Bonds to finance up to 100% of the cost of similar betterments.

*Objections to the Plan.* The objections to the plan as a whole do not attack its feasibility but only the alleged lack of necessity for any plan at all at this time. The attack is focused on the basic requirement of the remedial Act that the petitioner is unable to meet its maturing debts. It is contended that the proceeding has not been filed in good faith because the Railroad is in fact able to meet its maturing debts or at least could have done so by proper financial management. More specifically, it is stated that the refusal of the R. F. C. to extend its secured loans, by refunding or otherwise, except on the condition of the approval of the plan, is not due to the independent judgment of the R. F. C. but was inspired by the officers of the B and O and is therefore really collusive.[13]

In purported support of this main contention it is said (1) that in soliciting assents to the plan the petitioner made misrepresentations of fact; (2) that it has wasted funds otherwise available to meet the 1944 maturities in the amount of $30,-000,000 in the *over* maintenance of the Railroad; (3) that it unnecessarily carries in its working capital many millions of dollars that could be made available to meet indebtedness and (4) that it has improvidently used about $31,500,000 in the retirement of capital obligations maturing after 1944 which should properly have been applied on account of 1944 maturities. These particular contentions are advanced as circumstances tending to show bad faith in connection with the more specific and direct charge of collusion above mentioned. We will discuss these particular charges separately. Some of them need only brief comment.

We find no material misrepresentations of fact in the letters of the president of the Railroad inviting assents to the plan.

The criticism of the wording objected to seems to be to be based only on the objector's personal interpretation of the language and is more argumentative than factual. The B and O was actively soliciting assents to the plan and the intervenor, Mr. Randolph Phillips, was likewise actively urging the Convertible Bondholders to express dissent. In the course of the correspondence some unnecessary personal criticism was made by the B and O regarding Mr. Phillips. One statement was that "Randolph Phillips attempted to defeat the 1938 plan. If he had been successful, your bonds might have been wiped out and your road might be in bankruptcy today". Mr. Phillips' principal activity is that of a railroad economist of long experience. He particularly complains that this statement was a misinterpretation of his participation in the hearings on the 1938 plan, and asks that the statement as to his position then should be corrected. The court's understanding of Mr. Phillips' attitude toward the 1938 plan is stated in 29 F.Supp. at page 627. As will there appear, he considered the 1938 plan defective because it did not make sufficient provision for what might happen in the event of the inability of the B and O to meet the 1944 maturities. He states that he was not attacking the 1938 plan as a whole but endeavoring to improve it to avoid the contingency which the B and O now says confronts it. His present position, however, it clearly stated in his testimony and brief. It is that he opposes the whole of the present plan on the ground that the contingency which he anticipated in 1939 did not in fact occur in 1944 in that, as he contends, the Railroad was able to meet its maturing indebtedness in that year.

The contention that the Railroad has been intentionally over maintained ("gold plated") is based only on a statistical comparison (prepared by the objector) of the average maintenance expense ratio of the B and O and other railroads for 1929, compared with the ratios for 1943 and 1944, which show that the B and O ratio is higher for these latter years than for 1929, and apparently higher now than for other railroads. But the respective periods

---

[13] The only active proponent of this frontal attack on the plan as a whole is a Mr. Randolph Phillips who has an interest in the Convertible Bonds. Mr. Phillips is not a lawyer but a railroad economist who as an intervenor in the case, appeared *pro se* and actively participated in the cross-examination of witnesses and introduced evidence of two witnesses, Mr. Cassius M. Clay and himself.

are not fairly comparable by reason of differing prevailing conditions. What is overlooked is the higher taxes and cost of labor and materials in the later period. But apart from this there is a very simple explanation of the increased maintenance ratio in the latter period as explained by Mr. A. C. Clarke, Chief Engineer of the Railroad, and Mr. Roy White, its president. The higher expense in the latter years is due to much deferred maintenance which had been accumulated over the depression years, the effect of which was very pronounced in the case of the B and O.[14] The objector submitted no factual evidence based on inspection by experts that there was *over* maintenance of the B and O System.[15]

Mr. Phillips contends that the B and O is presently carrying in its balance sheet an unnecessarily large working capital, and that about $40,000,000 could be withdrawn from it to pay on account of the 1944 maturities. We are not impressed with the soundness of this contention. Without here analyzing in detail the several items of current assets and current liabilities, we are satisfied from the testimony of the B and O's financial vice president and from other evidence in the record, that no substantial cash sum could fairly be presently withdrawn from current assets to apply on the 1944 maturities. The question is not whether the available current assets could be used to pay debts in liquidation, but whether the working capital as a whole, necessarily excluding the large item of materials and supplies, is more than reasonably adequate for the B and O System as a going concern, doing presently a volume of $380,000,000 of business annually, operating in 13 States and having 128 bank accounts. The testimony of Mr. Snodgrass, the B and O's financial vice president, analyzing the April 1945 balance sheet, was to the effect that the available cash for current payments was only about $16,000,000, while he thought $20,000,000 was reasonably required. The later balance sheet of July 1945 is not very greatly different in its figures. We do not find that the working capital is unreasonably large. The contention to the contrary is largely based on comparison of the much smaller amount of working capital maintained by the B and O in prior years. It was one of the features of the 1938 plan that the then inadequate working capital might be increased by about $10,000,000.

The 1938 plan, Art. VI, provided for a substantial sinking fund to be applied to the retirement of $100,000,000 of aggregate principal amount of obligations without designating the particular bonds to be so retired, but expressly providing that the Company "may purchase bonds or obligations of any issue or issues eligible for acquisition under the preceding provisions of this Article VI in the open market or by call for tenders or otherwise at not exceeding the redemption price". In accordance therewith the Railroad has now retired over $100,000,000 of its capital indebtedness at a cost of about $67,000,000. Of this latter amount approximately $31,500,000 was applied to the retirement of capital obligations aggregating approximately $66,000,000 maturing subsequent to No-

---

[14] Counsel for the petitioner submits a statistical comparison of the maintenance expense ratio or average per mile of road, of the Baltimore and Ohio, the Pennsylvania, the New York Central and the Chesapeake & Ohio for each of the years 1922 to 1944, taken from Interstate Commerce Commission Reports. In this we find that the average maintenance expense per mile of road for the B and O for 1922 to 1929 was $5,227; for the Pennsylvania, $7,983; for the New York Central, $6,284, and for the Chesapeake & Ohio, $6,203. The respective figures were for 1944, B and O $8,788; Pennsylvania, $9,737; New York Central, $8,916, and Chesapeake & Ohio, $7,649. The compilation also shows that the average for the years 1930 to 1942 for the several roads was, B and O, $2,548; Pennsylvania, $4,123; New York Central, $3,603, and C & O, $4,119. It will be noted that in the railroad depression years 1930 to 1942 the average maintenance was considerably less than in the period 1922–1929. These figures clearly support the statements of Messrs. Clarke and White of the B and O that the heavier maintenance expense in the latter years was due to accumulated deferred maintenance. That railroad maintenance expense ratio has been much higher in 1944 than in previous years is also recognized in the 58th Annual Report of the Interstate Commerce Commission, pp. 18 and 19.

[15] See the comment by Circuit Judge Learned Hand on the value of merely statistical evidence of this character (without factual evidence of the condition of the particular railroad) in Delaware & Hudson R. Corp. v. Dancey, D.C., 51 F. Supp. 763, 766.

vember 8, 1944. A large part of the debt so retired consisted of B and O Refunding Bonds which were purchased and retired by the Railroad at a very heavy discount. The application of funds to the retirement of debts maturing after 1944 resulted in decreasing fixed charges by $2,500,000 more than if all the available funds had been applied to the retirement of earlier maturities. And the evidence shows that this application of that available cash has received the express approval of some of the Railroad's most important creditors as sound and advisable financing. Even if all the cash available for debt retirement had been applied solely to the retirement of obligations maturing prior to 1945 there would have remained owing on the 1944 maturities approximately $51,000,000.

We come now to the principal attack on the plan. It is the charge that it is not proposed in good faith,[16] because the R. F. C. would have extended the loans maturing in 1944 if the officers of the B and O had really wanted that done. Some color was given to this contention by the resignation of Mr. Cassius M. Clay, General Solicitor (assistant to the General Counsel) of the B and O, made public on the eve of the final hearing of this case on September 17, 1945. In his letter of resignation he criticized the plan to which he said he had long been opposed. The position taken by Mr. Clay requires fuller comment, which will be later made. It is bound up with the whole question whether the present position of the R. F. C. is an independently taken one based only on the financial conditions applicable to the case, or whether it is the result of inspiration and collusion with officers and directors of the Railroad to create an only simulated or "synthetic" financial embarrassment for the purposes of this case. This is a question of fact to be determined on the evidence.

Bearing on this issue, we have heard and considered the testimony orally given in open court and subject to cross-examination of all the principal persons now living having any knowledge of the subject, including Mr. Roy White, president of the B and O Railroad; Mr. R. L. Snodgrass, its financial vice president largely in charge of the present plan; Mr. Stewart McDonald, Chairman of the Road's Executive Committee; Messrs. Traphagen and Cheston, other members of the Board, and of Mr. Jones, former Chairman, and Senator Charles Henderson, present Chairman, of the R.F.C. All of these witnesses emphatically refute the suggestion that the past or present attitude of the R.F.C. was inspired or stimulated by the officers of the B and O. With equal clarity they assert that the position taken and maintained represents the independent judgment of the members of the R.F.C. acting in the interests of the United States as a large creditor of the B and O, and having due regard to the interests of the public and of the security holders of the B and O. There is no sufficient evidence in the case to warrant a rejection of the testimony of these reputable witnesses whose general credibility is in no way attacked and their evidence not impaired by cross-examination. And we find nothing in the nature of the case inconsistent with this definitely asserted position taken by the R.F.C.

Apart from the uncontradicted testimony the financial situation then existing is indisputable. The Railroad had no financial means to meet the 1944 maturities other than the collateral pledged therefor. Unsuccessful efforts had been made to refund the debt by public financing. The sale of the collateral would have had very disastrous effects on the B and O System and its earning power. Even if, by greater pressure or persuasiveness, the R.F.C. could have been induced to extend the loan for a few years more, the financial problem would have recurred with greater intensity in 1948 when the even much larger maturities come on. It seems improbable that they

---

[16] The requirement that the proceeding must be in good faith appears not only in Chapter XV, but in other chapters of the Bankruptcy Act of related subject matter. We have not found any express judicial construction of the phrase in Chapter XV proceedings; but under chapters dealing with adjustments of corporate or individual financial embarrassment, the phrase has received a judicial construction which is broader than intentional fraud.

For instance, if the plan proposed is manifestly impracticable, the petition may be dismissed because not filed in "good faith". See for illustration Fidelity Assurance Ass'n v. Sims, 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032; Tennessee Pub. Co. v. American Nat. Bank, 299 U.S. 18, 57 S. Ct. 85, 81 L.Ed. 13; Snyder v. Fenner, 3 Cir., 101 F.2d 736. But in this case the phrase, lack of "good faith" is used in its primary sense of intentional fraud.

could have been successfully refunded with the outstanding menace of the unrefunded R.F.C. maturities of $80,000,000 or more. The evidence given by Mr. Jones is very clear, definite and explicit that it was this condition that actuated him and through him the R.F.C. in insisting, as a condition to substantial extension of the 1944 maturities, that the later maturities should first be substantially extended. The dominant fact in the case is that the R.F.C. did take this position.

As we have stated, it was a feature of the 1938 plan that the $50,000,000 secured notes of which the R.F.C. held $13,490,000, and the indebtedness of $72,771,578 to the R.F.C. should be extended to mature in 1944. In 1939, when the 1938 plan was considered by the court, Mr. Daniel Willard was the president and Mr. George M. Shriver the senior vice president of the B and O. It is not now disputed that these two highly respected and long experienced railroad officials testified to their belief in entire good faith and on grounds which seemed reasonable, that in the working out of the 1938 plan the B and O would be able to meet these 1944 maturities aggregating about $122,000,000. It was thought that the reasonably expected increase in the market values of the collateral pledged for these loans and the general improvement of the Railroad's finances would enable the Road to successfully *refund* them or otherwise meet the problem. As we have seen, this enhancement of the market values of the collateral has been realized to a considerable extent but not sufficiently to make it possible for the Road to refund the present obligation to the R.F.C. by the sale of new securities to the public secured by the same collateral, without the postponement of maturities of other and soon maturing bond issues. And the evidence is clear that the R.F.C. early in 1944, took the position that it would not extend the loans unless there was a comprehensive plan for the postponement of these maturities.[17] A substantial reason for the position taken by the R.F.C. was that an extension of the loan was inadvisable in the interests of the creditor by reason of the uncertainty whether the B and O could successfully refund the heavy maturities of its senior mortgage bonds due July 1, 1948, and in 1950 and 1951, aggregating over $200,000,000 of principal. If they could not be successfully refunded, receivership or reorganization was highly probable. On the other hand, with them substantially extended, it was the judgment of the R.F.C. that a new bond issue, in the amount of the principal then due to it, secured by the collateral and bearing 4% interest, could be readily sold to the public. In this situation the present plan emerged which provides for such refunding, and the R.F.C. has agreed to accept the new 4% bonds at par and accrued interest in the principal amount of the obligation as payment in full.

Now we return to the letter of resignation by and the testimony of Mr. Clay. In 1941 he joined the legal staff of the B and O on the invitation of Mr. George M. Shriver, then its senior vice president. For some years theretofore he had been a member of the legal staff of the R.F.C. and had been actively engaged for it as a creditor in various railroad reorganizations. His chief work for the B and O was in matters before the Interstate Commerce Commission. Mr. Snodgrass, who is now the financial vice president of the B and O, had also been a member of the legal staff of the R.F.C. for some years before he was invited by Mr. White (president of the B and O and successor to Mr. Willard) to take the position rendered vacant by the regrettable death of Mr. Shriver. Mr. Snodgrass had also been engaged in railroad reorganization cases when with the R.F.C. When Mr. Snodgrass first assumed this position in 1942, he was told by Mr. White that his principal activity at once must be to consider plans to meet the approaching large maturities of 1944 and later years. As a result of this assignment it is Mr. Snodgrass and not Mr. Clay who has been in principal charge of the present plan after the failure of active efforts to meet the maturities by refunding. It appears that when Mr. Clay was first advised of the reported refusal of Mr. Jones to extend the 1944 maturities, and the probable necessity for a second plan under Chapter XV, he expressed skepticism about the genuineness of Mr. Jones' refusal and doubts about the necessity for the plan. Apparently in consequence of this the Railroad sought the opinion of outside legal advice which was subsequently received from Mr. Dulles of the New York firm of Sullivan & Cromwell. The opinion was to the effect that the proposed Chapter XV proceeding would of course vitally depend upon the real position taken by the R.F.C. It was

---

[17] See Petitioner's Exs. Nos. 65, 66, 67, 68, 69 and 70.

in consequence of this that the conference already referred to of May 12, 1944, was held with Mr. Jones and his associates in Washington, and Mr. Clay, in view of his previously expressed opinion, was invited to participate in the conference. He says that he was "shocked" when Mr. Jones firmly refused to modify the previously announced conditions for the requested extension.

Mr. Clay as a witness in the case was examined and cross-examined at great length. His testimony shows a considerable qualification of the briefer statements made in his letter of resignation. While he stated in his letter that he had regarded the plan as an unsound one, as a witness he said he did not question "the intrinsic financial soundness of the plan" and that he was "not questioning the good faith of any of the officers and directors of the B and O who became such after the time of the 1938 plan". We have carefully considered the whole of his testimony. In short summary we find that while Mr. Clay's own good faith as to his position need not be questioned, his expressed opinion that the plan was unnecessary and therefore not in good faith, was based on his own personal view and was not supported by the evidence or exhibits in the case. His personal opinion seems to have been based in his experience while associated with the R.F.C. that Mr. Jones was very reluctant to force any railroad into receivership or court reorganization, and on especially what he referred to as his understanding that there was a "gentlemen's agreement" at the time of the 1938 plan that the R.F.C. loans, then extended to mature in 1944, would again be renewed at maturity. There is no evidence in this case to show that there was such an "agreement". Mr. Clay appeared at the court hearings on the 1938 plan as counsel for the R.F.C. It is not contended that he or any one else made any commitment, express or implied, to that effect at that time. Mr. Willard and Mr. Shriver who, it is suggested, would have been the officers of the B and O to have had such an agreement with Mr. Jones, are now deceased. Mr. Jones as a witness in this case emphatically denied that there was any such agreement or understanding, and categorically stated that there was no discussion between himself and Mr. Shriver or Mr. Willard about the extension of the loans beyond 1944.[18]

The evidence is fully convincing that the Railroad was unable to meet its maturing obligations of about $82,000,000 due to the R.F.C. on August 1 and November 8, 1944, either from available cash or by refunding the loan; nor could it obtain a voluntary extension of the loan by the R.F.C. except on the condition of postponement of its principal obligations maturing in 1948, 1950 and 1951 in the amount of $218,832,350. But the question may still be asked whether the loan could not have been met by the sale of the pledged collateral either in 1944 or at the present time, especially in view of the fact that the market value of this collateral had in-

[18] Although Mr. Clay had been opposed to the plan since early in 1944, and the plan was made public on September 20, 1944, he did not resign until the eve of the September hearing in 1945. It appears that one factor inducing Mr. Clay's resignation arose from a theretofore recently published criticism regarding the policy of the R.F.C. relative to loans to railroads and especially the B and O, by United States Senator Wheeler. Attention was called to the fact that both Messrs. Snodgrass and Clay, former members of the legal staff of the R.F.C., had become associated with the B and O. Mr. Clay particularly felt unjustly criticized because he said, the inference was that he was in some way responsible for the plan to which in fact he had been personally opposed. It was urged by Mr. Randolph Phillips, an intervenor objector in this case, that there was something sinister in the engagement of Messrs. Clay and Snodgrass as officers of the B and O; and the same suggestion was made with regard to Mr. Stewart McDonald, the present Chairman of the Railroad's Executive Committee who theretofore had been the representative of the R.F.C. with regard to some of its loans to embarrassed corporations. But we find no basis in the evidence in this case for these suggestions. Both Messrs. Snodgrass and Clay seem to have been employed as members of the staff of the B and O on their respective merits. It is not uncommon for government employes to better their individual interests by becoming associated with private industries. It also appears that there was friction or at least lack of good personal relations between Mr. Clay and Mr. Snodgrass over the plan largely formulated by Mr. Snodgrass and opposed by Mr. Clay who seems to have thought it would not be successful for various reasons, but principally, because he did not believe Mr. Jones was really sincere in his refusal to extend the R.F.C. 1944 maturities except upon the stated condition.

creased on September 17, 1944 (just before the date of announcement of this second plan) to $128,000,000; and on September 6, 1945, it had increased to $172,000,000. The evidence in the case persuades us that despite the apparent ample excess value of the collateral, this method of relief was not practically available to the Railroad. In the first place, the present large increase in market value of the collateral is due to the prospect of the success of this plan; and the failure of the plan would inevitably substantially impair public confidence in the future prosperity of the Railroad with the consequent substantial decrease in the market value of the collateral. A more important answer to the suggested possibility lies in the nature of the collateral itself. A list of this collateral appears in the Appendix to the report of the Interstate Commerce Commission filed with the petition in this case. The principal items of value in the long list of this collateral are about $102,000,000 par value of the B and O Refunding Bonds which are affected by the plan. These pledged Refunding Bonds have never been issued or sold to the public but their issuance was approved by the Interstate Commerce Commission for the purpose of this pledge. They are now selling in the 70's but if the plan is not approved the market price would doubtless be very considerably less and their sale at a very heavy discount would result in a large increase in the Railroad's outstanding capital obligations and interest charges. Other important items in the list of collateral are very substantial holdings by the B and O of stocks of the Reading Company and the Western Maryland Railway, and the Southwestern Construction Company. It is of the utmost importance to the integrity of the B and O System that these stocks be held by the B and O. Their holding is highly important as the basis for important railroad operating arrangements between the B and O and the Western Maryland and Reading Railroads, and the Southern Railway. Freight originating or received on the B and O lines in the west is routed into New England through interchange by the B and O with the Western Maryland and Reading; and the B and O's access from Philadelphia to New York is through operating arrangements with the Reading.[19] It would be utterly disastrous to the unity of the B and O System and would entail a very great impairment of its earning capa-

city if, in consequence of the sale of these stocks, the operating arrangements now in force should be terminated. A serious threat of the sale of these items of collateral would almost inevitably necessitate a drastic reorganization proceeding under section 77 of the Bankruptcy Act to preserve if possible the integrity of the B and O System. See Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island & P. R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110. It is the very purpose of this present proceeding to avoid this disaster which would certainly cause great loss to the holders of securities affected by the present plan.

Looking at the broad and beneficial purpose of Chapter XV, we think the condition therein that the Railroad must show its inability to pay its debts as they mature should not be so narrowly and strictly construed as to deny approval of the petition in this case on the possibility that the R.C.F. could realize on its loan by sale of collateral which might so seriously affect the integrity of the B and O System as a going concern. (It was stated in the Report of the Committee on the Judiciary of the House of Representatives of May 27, 1942 (Report No. 2177, 77th Congress, 2nd Session) in respect to the proposed legislation which became the Act of October 16, 1942, that the purpose of the Bill was to enable railroads which are not insolvent and which are fundamentally sound as transportation systems but are handicapped financially by maturing obligations to enter into agreements with their creditors and security holders for the postponement or modification of obligations so as to avoid the drastic overhauling of their capital structures provided for in section 77. This purpose would be defeated if such a railroad could not take advantage of the Act without disposing of collateral that would greatly impair its usefulness and efficiency as a going concern. Such a sale of collateral by creditors might be enjoined in a proceeding under section 77 of the Bankruptcy Act. Continental, etc., Bank & Trust Co. v. Chicago R. I. & P. R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110; but see also 15 U.S.C.A., s. 605, last sentence). And it may be added that despite the present apparent margin of value in the collateral for the secured loans, it is by no means certain that collateral of this type would be readily

---

[19] See Petitioner's Ex. No. 90, Chart of the B and O System.

marketable in bulk at its present quoted prices. Present market prices have been largely influenced by the progress of the plan. If it fails a substantial recession in the present prices is clearly indicated.

*Is the plan fair to all affected classes?* We have determined that the plan as a whole, as a substantial recapitalization of the petitioner, is intrinsically sound and financially feasible. Section 1225 of the Act requires as a further condition of approval, that the plan must be fair and equitable and as such will "(a) afford due recognition to the rights of each class of creditors and stockholders and fair consideration to each class adversely affected, and (b) will conform to the law of the land regarding the participation of the various classes of creditors and stockholders."

In our opinion the plan does conform to legal standards and requirements. There is no reduction of the amount of the contractual obligations of the B and O for either principal or interest, and no impairment of the security therefor. The only change is postponement of maturity of principal, and the time of payment of interest made contingent upon earnings, but fully cumulative until finally paid. Such changes are not uncommon features in railroad reorganizations or adjustments. In quality they are similar to those made in the B and O 1938 plan.

We will now see whether it is fair to the several classes *inter sese*. In the first place, it is to be noted that the plan affects nearly all of the petitioner's present funded debt.[20] The main features of the plan are the extension of the maturities of the several classes and changing a certain amount of now fixed interest to contingent interest, reducing about one-third of the present fixed interest to contingent interest. With the exception of the interest on the Refunding Bonds, all the interest made contingent is presently unsecured interest. Some of the interest now both fixed and secured on Refunding Bonds is made contingent but payable from available income prior to the contingent interest which is unsecured.

The eight classes affected by the plan may, for convenient comparison as to their respective treatments, be grouped into four classes: (1) R.F.C. as holder of secured notes; (2) holders of prior lien bonds, that is, First Mortgage 4's, First Mortgage 5's, Southwestern Division 5's, Pittsburgh, Lake Erie & West Va. Bonds, Toledo-Cincinnati 4's; (3) holders of junior lien bonds, that is, Refunding and General Mortgage 5's and 6's, and (4) holders of unsecured obligations, that is, Convertible 4½'s.

By the plan each of these classes is required to make certain concessions or, if you please, sacrifices in the recapitalization It is clear, we think, that the aggregate of the respective sacrifices to the plan as a whole greatly improves the position of the Railroad and adds to the prospect of its long continued prosperity as a going concern. In this bettered position of the entity each of the affected classes participates and is itself bettered at least in public estimation as reflected in Moody's Rate Manual. On this branch of the case the particular inquiry is whether the sacrifices which each class has made to the whole is reasonably in proportion to its present position. In our opinion the answer is—Yes.

Each of the four classes (except the Refunding Bonds) agrees to an extension of maturity—20 years for class 1; 25 to 30 years for class 2; 50 years for class 4. The extended maturities are fairly evenly spaced. Class 1 also yielded a reduction in interest rate under the 1938 plan which is continued under the present plan. Presently unsecured fixed interest of some of the class (2) bonds yields from fixed interest position to that of contingent interest; class (3) yields a portion of its fixed and secured interest to contingent interest, the latter payable, however, prior to the unsecured contingent interest. Class (4) yields its position of unsecured fixed interest to that of contingent. The preferred and common stocks of the Railroad are also, of course, affected by the plan. The modification of the maturities and change from fixed to contingent interest of some of the bond issues is an advantage to the stock; but the features of the plan which provide for the application of available income to a capital fund and to the substantial sinking fund and other limitations upon dividends are, of course, restrictions upon the stocks.

With respect to the impact of the plan as a whole upon the several classes, it is obviously unnecessary to consider class 1, the R.F.C., because it had fully assented to

---

[20] As of August 31, 1944, the funded debt amounted to approximately $534,000,000.

The par value of the securities affected by the plan aggregate $495,799,164.

the plan. Nor is it necessary to especially discuss the fairness of the plan to the senior bond issues in class 2. It appears to us, on the face of the plan, that it is equitable to them *inter sese,* and there has been nothing of importance called to our attention to the contrary.[21] As to the class 3, Refunding Bonds, there is no active opposition to the plan as a whole or contention that it is unfair to them.[22] The report of the Interstate Commerce Commission deals in much detail with the several adjustments made in the several bond issues. We think it unnecessary to repeat here what has there been carefully outlined. This leaves for particular discussion the effect of the plan on the Convertible 4½'s.

■ In considering whether the plan affords fair treatment to the Convertible Bonds, we must compare their original position in the Railroad's capitalization with their changed position under the plan, and keep the latter in mind in the perspective of the whole plan. The Convertibles were originally issued under an indenture dated February 1, 1930, with Bank of Manhattan Trust Company as Trustee (now Bank of Manhattan Company). The unsecured interest rate of 4½% per annum was a fixed charge but pursuant to the 1938 plan was temporarily made contingent. They were redeemable, as a whole, on any semi-annual interest payment date at 105 prior to 1955, the premium decreasing thereafter. The principal was payable in 30 years. They are called Convertibles because they may now be converted at par into common stock, subject to certain adjustments, at any time up to 15 days prior to redemption or maturity. Under the original indenture the conversion rate was at over par for the common stock but under the 1938 plan the rate was changed to par for par, that is, ten shares of common stock for a $1,000 bond. The present plan makes only two changes in their status: (1) the postponement of their maturity date for 50 years to 2010, and (2) the continuation of their fixed interest as contingent upon earnings, but fully cumulative as in the case of other contingent interest. The present conversion feature is retained without change. They will be redeemable for the sinking fund at par and accrued interest, but otherwise will be redeemable as in the indenture up to the original date of maturity, 1960, and thereafter at a premium to be determined in the manner applicable to the First Mortgage Bonds. They are eligible for retirement through a part of the sinking fund.

■ It will be noted that the Convertibles are the lowest grade of securities (other than stocks) affected by the plan. It is natural to expect therefore that this relative position must be retained by them under the plan. It is true that their maturity date is extended somewhat longer than in the cases of other classes affected by the plan, and a few years later than the maturity date for the Refunding Bonds; but we do not consider this fact unfairly discriminates against the Convertibles because although the Refunding Bonds have a junior lien, a considerable portion of their *secured* interest is made contingent. The plan as a whole seems to us to give adequate compensatory advantages to the Convertibles in comparison with the other affected classes. All are benefited by the avoidance of receivership and drastic reorganization. If the latter should eventuate the Convertibles would doubtless suffer the greatest proportionate loss because their position is entirely *unsecured* and they would rank only as common creditors ahead of the stock. The reduction of their fixed interest to contingent is only in accordance with present realistic conceptions of railroad financing. If the interest is in fact not earned it simply cannot be paid. Legal redress by receivership and sale is largely futile with respect to railroads.[23]

---

21 The only intervenor who has expressed objection to the plan (but without participation in the hearing) who is the holder of any of these prior lien bonds, is a Mr. Darlow who, in his petition for intervention without other proof, states that he holds $37,000 par value of B and O First Mortgage and Refunding Bonds. One other intervenor represented by counsel at the hearing holds $1,500 par value of the First Mortgage 5's. He does not oppose the plan as a whole but has suggested certain modifications which will be later noticed.

22 The holder of $5,000 par value of Refunding Bonds represented by counsel at the hearing has suggested certain modifications.

23 In Commissioner Mahaffie's partially dissenting opinion in the Interstate Commerce Commission Report, it was aptly said: "By this time, however, security holders must realize that interest can be paid and maturities can be met only as earnings warrant; that fixed maturities, in the absence of adequate earnings are a delusion; and that insistence on them, in such circumstances, is more likely to be

The principal objector to the treatment of the Convertibles in the plan is the Mr. Randolph Phillips above mentioned.[24] He is the holder of a one-third interest in $100,-000 par value of the Convertibles bought from time to time during 1939 to 1942. The only evidence produced by him on this phase of the case consisted of his own lengthy testimony in which he introduced numerous exhibits principally of statistical computations which he considered supported his personal opinion as a railroad economist. One of his main contentions is that the Convertibles surrendered 17 "rights", while the stockholders surrender practically none. The 17 so-called "rights" are only specific instances of the operation of the capital fund and sinking fund and refunding provisions in the plan, in relation to the postponement of maturity and reduction in interest status of the Convertibles. We think it unnecessary to discuss the argument in detail. The provisions in the plan for the capital and sinking funds and refunding of some of the prior lien bonds are important and we think highly desirable features of the plan as a whole. The capital fund is wisely provided for physical extensions and betterments to the Railroad. It has become a rather common feature of Railroad reorganizations in more recent years. A somewhat similar fund was provided for in the 1938 plan. The sinking funds, which may reach very considerable amounts under the present plan, are highly desirable for capital debt reduction. The provisions for refunding are also beneficial to the plan as a whole because that is frequently the one practical method of meeting principal maturities; and also affords opportunity when available to take advantage of lower interest rates.

Mr. Phillips also makes the objection that reducing the fixed interest to contingent may possibly result in giving the Railroad uncompensated for credit in the use of money which would otherwise be required to be paid as fixed charges. This, however, is merely an incident of the plan which is equally applicable to the contingent interest of other affected classes, and was applicable also to the 1938 plan after the approval of which he purchased his Convertible Bonds.

Mr. Phillips further submits an argument based on statistical compilations made by him to show that the "margin of safety" for payment of interest on the Convertibles is decreased by the operation of the plan. His exhibits purport to show that without the plan the number of times interest would be earned on the Convertibles is 1.506, but under the plan the ratio would be 1.329, a decrease of .177. This is said to be the result of the application of available income (before interest on the Convertibles) to the sums allocated to the capital fund and the sinking funds. The assumption is made that for the first 21 years' operation under the plan the average income available for fixed charges would be just the same as that which prevailed in the years 1921 to 1941. It is however, properly pointed out by counsel for the Railroad that the fallacy in the computation lies in the failure of the statistical exhibits to adequately take into account the reduction in capital debt with consequent reduction in interest charges resulting from the application of the sinking funds. It is obvious that the reasonably anticipated effect of the sinking fund provisions in the plan should be a substantial reduction of debt with decrease of total fixed charges and with consequent increase in the margin of safety

productive of 'headaches' than of actual receipts."

24 Another holder of some Convertible Bonds (amount not stated) who is an intervenor opposed to their treatment in the plan is a Mr. George H. Phillips (not related to Randolph Phillips). His particular objections are included in more detail in those advanced by Randolph Phillips. Both these intervenors also opposed approval of the plan by the Interstate Commerce Commission and their objections as here submitted seem to be substantially the same as those summarized by the Interstate Commerce Commission in its Report, printed pages 60–62, annexed as an exhibit to the petition.

It does not appear that Randolph Phillips as the holder of Convertible Bonds has, or is likely to sustain any loss therein as a result of the plan. As requested during the hearing, he has submitted a schedule of his interest in Convertible Bonds purchased and sold from March 21, 1939 to April 30, 1942. It appears therefrom that the majority of his bonds were bought at then very low market prices ranging from 12 to 40 as compared with present market prices of about 70 for the Convertible Bonds. He states that his opposition to the plan is based not on pecuniary considerations but on his conception of public policy and principle.

for interest payments on the Convertibles as well as on other classes affected by the plan. The revision of the exhibits to give effect to this anticipated reduction in interest charges, as prepared by counsel for the B and O, indicates that the decrease, if any, in the so-called "margin of safety" for the Convertibles would be negligible in amount, and if additional sinking fund payments were made to "match" dividends declared as required by the plan, the margin of safety would be really increased and not decreased. Of course the assumption that the income available for fixed charges for the next 21 years will be the same as the amounts in the prior period 1921 to 1941, is mere assumption. They may, of course, be much less by reason of generally changed economic conditions which cannot be foreseen, or they may be more than is now anticipated, possibly by reason of increased earnings from extensions or betterments by the use of the capital fund for essential improvements or by use of income available for other proper corporate purposes above and beyond the capital fund, and possibly there may be additional savings in interest charges by the refunding provided for in the plan of prior lien bond issues at lower interest rates than those now applicable.[25]

On behalf of the Convertibles Mr. Phillips also urges that if the plan as a whole is found to have been put forward "in good faith", there should be several important modifications in the plan to compensate the Convertibles for the sacrifices made by them to the plan. Specifically he contends, that (1) no dividends should be permitted to be paid until a reserve fund equal to three years interest on all bonds bearing contingent interest under the plan has been accumulated; (2) in every year in which a dividend is declared on any stock of the Company all Convertible bondholders must first be paid an additional $1\frac{1}{2}\%$ interest; (3) each Convertible Bond should be convertible into 40 shares of common stock rather than the present amount of 10 shares, and (4) when the suggested reserve fund is less in amount than three years interest, the majority of the Board of Directors should be elected by the contingent interest bondholders, and the majority of the first formed Board of Directors after confirmation of the plan should be selected by the court, with a delegation of their powers for at least two years to a finance committee of three; likewise selected by the court. Some of these suggested modifications will be later discussed but with respect to the suggestion for an additional $1\frac{1}{2}\%$ interest rate for the Convertibles

---

[25] The decrease in the ratio from 1.506 to 1.329 does not seem very serious, especially when it is remembered that the decreases are merely estimates based on the assumption that for a future period of 21 years the net income applicable to fixed charges will be the same as the average of the preceding years 1921 to 1941. The estimated decrease in the margin is, however, seemingly made more impressive by Mr. Phillips' calculation that it amounts to 35%, that is .177 divided by .506 (See Phillips' Exs. Nos. 24, 25 and 26). The revised computations made by counsel for the B and O to give effect to the sinking fund, purport to show very different results. Their calculation shows that if the present plan had been in effect for the years 1921 through 1941, the reduction in capital debt would have been $125,637,115, with a consequent reduction in charges of $5,689,719. These figures are based on the assumption that during that period no dividends would have been paid, but that if under the plan maximum dividends had been paid (with increased payments into the sinking fund in accordance with Art. VII of the plan), the reduction in debt

would have been $173,033,517, with consequent reduction in charges of $7,863,524. By extending the prior period to include the years 1942–1944, they obtain a 24-year average of 1.620, for the number of times fixed charges, including contingent interest, would have been earned without the plan, and 1.601 under the plan. As so calculated the "margin of safety" without the plan would be .620 and under the plan .601. The resultant figures for the average decline in the margin of safety is thus said to be only 2% as compared with the figure of 35% derived by Mr. Phillips. And on the same basis of computation they figure that if dividends were paid with consequent additional sinking fund payments, the resultant figure would be an increase of 15% instead of a decrease of 35%.

These latter computations by counsel for the B and O are in turn criticized by Mr. Phillips for various reasons. In view of the assumptions and uncertainties involved we do not consider either set of computations as definitive or satisfactory evidence, but only as the respective contentions of the parties as to the possibilities.

and the four times increase in their conversion privilege, it is sufficient to now say that these seem to us to be an unjustifiable preference for the benefit of the Convertibles which would be inequitable to the other affected classes.[26]

The principal amount of Convertible Bonds outstanding in the hands of the public is $61,906,000. Of this amount 6290 holders representing 67.36% of the outstanding bonds have affirmatively assented to the plan. Persons holding only $167,000 par value of the bonds have dissented. The market price for the Convertibles had risen from a low of 12 in 1940, to 37 on September 19, 1944 (the day before the announcement of the plan), and to a high of 72 in 1945 after the approval of the plan by the Interstate Commerce Commission, and the filing of the petition in this court.[27]

While our conclusion that the plan is fair to the Convertibles has been independently reached, it is at least worthy of note that despite the objections interposed by only two intervenors in the case holding Convertible Bonds, the plan has been approved by such a large percentage of the holders in number and principal amount of these bonds. They doubtless realize that while their position as investors is less favorable than that of the holders of both senior and junior lien bonds, the plan as a whole has advantages to them in avoiding receivership or reorganization and holds out to them a reasonable prospect of continued interest payments which, after all, is the best assurance for unsecured bondholders.

*Proposed Modifications of the Plan.* Most of the few intervenors in the case propose modifications of the plan with respect to the payment of dividends. In general they urge that more drastic restrictions should be imposed than those contained in the plan. In this respect the plan (Art. VII) provides that—

"During the period of the plan, dividends may not be paid on the stock of the Company of any class except out of accumulations of Available Income allocated pursuant to paragraph numbered (7) of Article III hereof, nor unless prior to the declaration of any such dividend (a) all contingent interest accrued as provided in Article IV hereof, for prior calendar years, shall have been declared payable and paid, or provision made for its payment, and (b) the Board of Directors shall have determined that the Available Income for the current year will be sufficient for the purposes specified in paragraphs numbered (1), (2), (3), (4), and (5) of Article III hereof and provision shall have been made for the payment of the amounts necessary to satisfy fully such purposes. In any year in which, as of the date of declaration of such dividend, System charges for interest and guaranteed dividends, on an annual basis, exceed $20,000,000, the Company shall pay into Sinking Fund out of accumulations of Available Income allocated pursuant to paragraph numbered (7) of Article III hereof, an amount equal to such dividend prior to payment thereof."

Article III of the plan provides for the determination and allocation of available income. As we have seen, it requires, after the payment of fixed interest, that the income shall be applied (1) to the creation of a capital fund; (2 and 3) to a first sinking fund; (4) to the payment of secured contingent interest; (5) to the payment of unsecured contingent interest; (6) to a second sinking fund payment of 50% of the then remaining balance, except that when all fixed and contingent interest and guaranteed dividends are less than $22,000,000, this payment to the sinking fund need not exceed $750,000; and (7) the balance to be available for other corporate purposes. And it will be noted that out of this final remaining balance, from which dividends can only be paid, an amount equal to any dividend must be paid into the sinking fund ("matching" sinking fund and dividend payments) until charges for System

---

[26] As to the suggested change in the conversion basis, it is to be noted that at the present market rates of about 70 for the Convertibles and about 22 for the common stock, the proceeds of sale of a Convertible Bond could now be reinvested to acquire about 30 shares of the common stock, if the change is intrinsically desirable. Of course we appreciate that the conversion privilege is usually exercised only when there is a market profit in making the exchange.

[27] Petitioner's Exhibits Nos. 101, 102. Counsel for the Petitioner has filed with its brief a list of about 150 banks, insurance companies and other institutions holding over $10,000 par value of the Convertibles which have affirmatively assented to the plan. This was compiled from petitioner's Ex. 100, which includes all the written assents to the plan. It is said that many of the Convertibles are held by individuals in the European war zone and could not be reached for assents to the plan.

interest and guaranteed dividends are reduced to $20,000,000, thus leaving available for dividends only one-half of the sum that might otherwise be available after the prior payments so allocated. These restrictions on the payment of dividends are indeed very substantial. For example, if we apply them concretely to a liberal estimate for any one year of $45,000,000 for income available for charges, it is found that the effect of the restrictions will be to leave only $3,000,000 as the *maximum* sum possibly available for dividends on preferred and capital stocks having an aggregate par value of over $300,000,000.[28] On the same estimated net income, without the plan, the sum that would have been available for dividends would be $18,000,000.

Various suggestions have been made for further restrictions on the payment of dividends.[29] We have considered all of them and have concluded that the restrictions in

---

[28] For the details of this calculation see brief of counsel for Petitioner, pp. 31–32. The example set out in the brief is—

| | |
|---|---|
| "Projected income available for charges | $45,000,000 |
| Deduct: | |
| (1) Fixed interest and other fixed charges Article III (a) | 19,000,000 |
| Balance | 26,000,000 |
| (2) Capital Fund ($4,250,000) * and First Sinking Fund ($1,750,000). Article III(1) & (2) | 6,000,000 |
| Balance | 20,000,000 |
| (3) Contingent interest (Article III(4) & (5) | 8,000,000 |
| Balance | 12,000,000 |
| (4) Second Sinking Fund (Article III(6) | 6,000,000 |
| Balance available for other proper corporate purposes, (Article III(7) | 6,000,000 |
| Deduct: | |
| (1) Maximum dividend payable (Article VII) | 3,000,000 |
| Balance | 3,000,000 |
| (2) Additional Article VII Sinking Fund if maximum dividend is paid | 3,000,000 |
| | $ 000 |
| Maximum amount required to be expended for benefit of bondholders under the Plan in addition to all interest | $15,000,000 |
| Amount available for any proper corporate purpose if there were no Plan upon expiration of the 1938 Plan: | |
| Projected income available for charges | $45,000,000 |
| Deduct: Fixed interest and other fixed charges | 27,000.000 |
| Balance freely available in discretion of President and Directors | 18,000,000 |
| Maximum amount required to be expended for bondholders if there is no Plan (other than payment of interest) | None |
| Excess of amount which could be declared as dividends to stockholders if no Plan, compared to what could be declared under Plan. See above, ($18,000,000. minus $3,000,000.) | $15,000,000 |

* Note: 2-½% of estimated gross of $320,000,000 less estimated depreciation of fixed property of $3,750,000."

[29] Some of the suggestions for further restrictions on dividends are (1) no dividend should be paid until interest and guaranteed dividends are reduced to $20,000,000 a year, or (2) the capital debt does not exceed $450,000,000, or (3) a reserve fund equal to the interest requirements for two years has been created, or (4) the plan has been in operation for ten years. Still another suggestion is that no dividends be permitted until the annual interest charges are reduced by $8,000,000, plus $200,000 for each year by which the maturity of the Convertible Bonds is extended beyond 1960. Still another suggestion advanced by Mr. Randolph Phillips is (a) no dividends be paid until a reserve fund equal to three years interest on all bonds bearing contingent interest under the plan has been accumulated or (b) in every year in which a dividend is declared on any stock of the Company the Convertible Bondholders must be paid an additional 1½% interest.

the plan are amply sufficient for fairness of treatment of the Railroad's creditors. As we have previously pointed out, if the Railroad is to remain under private management, the stockholders must have some incentive for good management and as they are one of the classes necessarily affected by the plan, it should be fair to them as well as to the creditors.

The plan proposes no change in the management of the Railroad or in the voting rights in or control of the Company, or in the manner of the selection of its Directors. With regard to this, section 1225 of the Act provides that no plan shall be approved unless the court finds with respect to the continuation of the management and control of the petitioner and the power and manner of selection of its directors and officers, that the plan "is adequate, equitable and in the best interests of creditors and stockholders of each class, and consistent with public policy". Several of the intervenors proposed modifications of the plan in this respect. Mr. Randolph Phillips proposes that a whole new Board of Directors and its executive committee should be selected and appointed by the court. In this connection he has made a sharp and pointed attack not only on the efficiency of the present management, but also on their good faith and honesty of purpose. His contention is that the present management of officers and directors has mismanaged the Railroad and that the present plan has been conceived for the express purpose of increasing the value of the common stock at the expense of the bond creditors. As previously indicated we find no evidence in the case sufficient to substantiate this charge. It is true that the market price of the stock has advanced materially since the approval of the plan from less than 10 in 1944 to over 20 in 1945, and proportionately even a little more than the increase in the market price of the Convertibles; but it is not uncommon that the lower grades of securities in a corporation respond more actively to the improved financial condition of the corporation than its senior securities. The officers and directors of the B and O do not have any unusual amount of holdings of its

stocks. On the evidence in the case we find no basis for the charge of mismanagement either as to its efficiency or its good faith. The present management has inherited a financial set-up that was created in former years of more liberal railroad financing. The plan which the officers and directors have evolved is, in our opinion, one designed to meet and correct this condition for the future and has been conceived in the interests of all the securityholders of the Railroad.

Without joining in this attack upon the present management, some of the other intervenors propose that, in view of the reduction of some of the presently fixed interest to contingent, holders of the latter securities should be given the power to nominate and elect one or more of the Board of Directors. Here it is to be noted that after the 1938 plan was put into effect the stockholders voluntarily elected three of the present directors who were representative of creditors' interests (Messrs. McDonald, Cheston and Traphagen), but counsel for the B and O urge that to require an involuntary selection of a representative of the holders of contingent interest bonds would necessitate an amendment of the charter of the Railroad which might endanger its partial exemption from Maryland State taxation to the detriment of all its security holders. The 1827 charter of the Railroad contained this tax exemption which, under the well-known Dartmouth College decision (Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 4 L.Ed. 629) constituted an irrepealable contract, and it is feared that the voluntary acceptance of an amendment of the charter would impair the exemption.[30]

We have given careful consideration to this proposal for modification. In view of the long extension of maturity of the Convertibles, and the importance to them of first hand knowledge of the management of the Railroad, we have concluded that they should be entitled to have at all times representation on the Board of Directors by the selection of one member of the Board, to be nominated by the Trustee under the Convertible Bond Indenture. Our approval of the plan will, therefore, be

---

[30] The legislative and judicial history of this partial state tax exemption is long and interesting. See Md.Acts of 1826, c. 123, s. 18 (Petitioner's Ex. 5); Md.Acts of 1878, c. 155; Mayor and City Council of Baltimore v. Baltimore & O. R. Co., 6 Gill, Md., 288, 48 Am.Dec. 531; State v. Baltimore & O. R. Co., 48 Md. 49; State v. Baltimore & O. R. Co., 127 Md. 434, 96 A. 636; State Tax. Commission v. Baltimore & O. R. Co., 179 Md. 125, 17 A.2d 101.

upon the condition that at the next annual election of Directors and succeeding elections, one of the Directors of the Railroad shall be selected by the stockholders to represent the Convertible Bonds if a reasonably suitable nomination is made therefor by the Trustee. And we are of the opinion that this condition can be imposed without necessity of amendment of the charter, by the retention of jurisdiction of the case by this court to insure compliance with the condition. We are, however, of the opinion that this modification is one that will not require re-submission of the plan either to the Interstate Commerce Commission or to the securityholders, and if accepted by the management of the Railroad will not require submission to the stockholders. A similar ruling was made in a recent Chapter XV case. Ewen v. Peoria & Eastern R. Co., D.C., 34 F.Supp. 332, 338. In view of the better position of the other classes of bondholders affected by the plan, we do not think it necessary to provide for their required representation on the Board of Directors.

Another modification proposed is that the Railroad be required to accumulate a reserve fund to pay three years' contingent interest which, on the Refunding Bonds alone, would amount to many millions of dollars. While this proposal is a plausible one in the interest of the contingent bondholders, we do not think it is either necessary or financially advisable. It would result in tying up a large sum which would otherwise be available for possibly needed betterments or extensions or reductions of capital debt. It might also seriously impair the ability of the Company to accomplish a desirable reduction in the interest charges by refunding the prior liens at a more favorable rate, by withdrawing from use funds which might otherwise be available for payment of premiums on the prior lien bonds to be refunded.

■ The indentures securing the Refunding and Convertible Bonds contain prohibitions against the Railroad making any *new* mortgages to take precedence over them. Some of the intervenors object to the features of the present plan which provide for refunding the prior lien issues which, of course, is necessarily inconsistent with these covenants in the original Refunding and Convertible Indentures. But as we have previously pointed out, we consider the refunding provisions of the present plan to be of real importance to the

plan as a whole, and really in the interest of all classes including the Refundings and Convertibles, because it is quite possible that this privilege of refunding may take advantage of even existing lower interest rates with consequent reduction of interest charges.

■ Counsel for Crozier and others as intervenors, urge the necessity for modification or at least clarification of the 1944 plan with respect to its effect on the 1938 plan. In this connection it is to be remembered that the 1938 plan was implemented by supplemental indentures defining the rights of the affected bondholders, and the 1944 plan will likewise be so implemented. In some respects the supplemental indentures under the 1938 plan changed and increased the rights of some classes of affected bondholders. The point now made is that the provisions of the 1944 plan are not entirely clear as to whether the new supplemental indentures will retain the increased rights given by the supplemental indentures under the 1938 plan, or whether these rights will be entirely superseded by the new supplemental indentures. The importance of the point is particularly called to our attention with respect to the conversion privileges attaching to the Refunding and Convertible Bonds. With respect to the Refundings, there was no privilege of conversion in the original indenture of 1915; and as to the Convertibles, the supplemental indenture under the 1938 plan provided a more attractive conversion rate (par for par) than had previously existed. Art. IX, s. 12 of the 1944 plan provides "neither the Plan nor the supplemental indentures to be entered into pursuant thereto shall in any way be deemed to modify the rights of the Company or of any of its creditors except as specifically provided in the Plan and said supplemental indentures." With respect to the Convertibles privilege, the plan expressly states "the conversion feature presently attaching to the Convertible Bonds will be made effective with respect to the new Convertible Bonds". There is, therefore, no uncertainty with respect to them but there is apparent uncertainty or ambiguity with respect to the continuation of the conversion privilege now applicable to the Refundings as there is no similar express provision of the plan for the continuation of their conversion privilege. However, we think it is sufficiently clear from the plan as a whole, and as conceded by counsel for the B and O, that it

was intended that the Refunding Bonds should retain their present privilege of conversion given by the 1938 plan. And indeed this is recognized in the report of the Interstate Commerce Commission (p. 34) where, in referring to the new proposed supplemental indenture, it is said: "The Refunding Bonds are convertible into common stock of the applicant up to 15 days prior to maturity, or 15 days prior to any date fixed for redemption of the bonds at the conversion price of $100 a share." While we think there is no doubt as to what was intended, the plan should be modified or clarified to expressly retain the conversion privilge for the Refundings. This does not require any re-submission of the plan.

It was also suggested by counsel for two small bondholders that this court should under the Soldiers' and Sailors' Civil Relief Act, 50 U.S.C.A. Appendix .§ 520, appoint counsel to represent holders of securities affected by the plan who may be at present in the Armed Services of the country, the fee to be paid by the petitioner. It is possible, of course, that there may be such security holders but there is no definite evidence in the record with regard thereto. However that may be, we do not think the Act referred to applies to a case of this nature. The wording of the Act comprehends cases where soldiers and sailors are sued as defendants; while this proceeding is in the nature of an "in rem" and not against named defendants. The suggestion for the appointment was not timely, having been made only at the beginning of the final hearing. Such appointment made at that late date, without adequate time for preparation, would have been substantially futile. Moreover, we think there was no necessity for such an appointment. The very nature of the case requires careful independent consideration by the court with respect to the rights and interests of all securityholders affected by the plan all security holders affected by the plan by counsel. See Irving Trust Co. v. Fif-

teen Park Row Corp., 182 Misc. 1044, 51 N.Y.S.2d 724.

There are a few additional proposed modifications submitted by some of the interveners which we have considered but which are so relatively minor in the perspective of the plan as a whole that they do not warrant individual discussion.[31] Even if some of them could be considered as reasonable and not prejudicial to the plan as a whole, we do not think they are necessary or really advisable. The plan constitutes in effect a very comprehensive recapitalization of the major portion of the Railroad's capital indebtedness which has resulted from a gradual growth and extension during many years past and involves a presently complex legal structure resulting from many separate mortgages and other indentures, each containing many detailed provisions. In such a situation it is inevitable that any comprehensive plan of recapitalization will entail some collision between details of existing indentures and their revision for the future. All these matters have been specially considered by the Interstate Commerce Commission which, by its experience, is well equipped to pass on such questions. Our independent examination of the plan as a whole leads us to the conclusion that no inequity has been done to the several affected classes and we find no compelling reason for its modification other than has been stated. Even if it were conceded that the plan is not ideal in every minor respect, that would not be a sufficient ground for withholding approval.[32] Some of the more important modifications proposed and above discussed would seemingly require resubmission to the Interstate Commerce Commission and to the many thousands of security holders who have approved the present plan, with consequent undesirable further delay, expense and uncertainty as to final approval. We do not think that this would be in the best interests of the classes affected by the plan, or any of them.

---

[31] Among other proposed modifications are (1) that additional bonds should not be issued to finance betterments at 75% of cost, or 100% for Emergency Bonds; or, as to the latter unless limited in amount to 75% of cost, of improvements, and then only if authorized by two-thirds of the directors; (2) that the directors should not have the discretion to apply any portion of the sinking funds to maintenance of working capital; (3) that the capital

fund should be limited to 2½% of gross operating revenues; (4) that any gains or losses on the sale of property be excluded in determining available income; (5) that all bonds purchased with sinking fund moneys should be purchased only at less than par; (6) suggested clarification of wording of some provisions of the plan, which we think not necessary.

[32] See In re Chicago & N. W. R. Co., D.C., 35 F.Supp. 230, 256.

We have accordingly reached the conclusion that the plan should be approved by this court with the modifications stated; and counsel are requested to submit a decree in accordance therewith.